JAMES CRUM, Administrator,

*v.*

MARY THORNLEY *et al.*

1. INSANITY—*evidence of.* Homicide, followed by suicide, and a disposition of property entirely at variance with long declared intentions, and the exhibition of unnatural malice toward a child, are not of themselves sufficient to raise a presumption of insanity and the want of a disposing mind.

2. So where a father, believing that his son has greatly wronged him, attempts to kill him, and inflicts a mortal wound upon himself, coolly and deliberately, and expresses regret that he has not accomplished his purpose, and then takes from his pocket a package of bonds and gives them to a favorite daughter-in-law, thus departing from long previously declared intentions as to the disposition of these bonds—the bonds not amounting to more than a third of his estate: *Held,* that these facts do not establish insanity so as to defeat the gift.

3. GIFTS—*the rule of evidence in relation to.* The rule which permits evidence as to the pecuniary condition, means and ability of the beneficiaries of a will, and of those who might be benefitted by overthrowing it, with a view of determining whether the testator appreciates his relation to them, and exhibits a capable and disposing mind, has no application to the case of a gift accompanied with delivery.

APPEAL from the Circuit Court of Morgan county ; the Hon. CHARLES D. HODGES, Judge, presiding.

Ralph Thornley, who was eighty years old at the time of his death, was possessed of property amounting in value to about $25,000. Of this amount, some $8,000 was in U. S. bonds and notes. The rest of his wealth consisted mostly of land. He has been living with his two sons, Samuel, who was unmarried, and Hugo, who was married and had four children. The father had frequently expressed an intention as to the disposition of his property, and it seems that he proposed to give his bonds and notes to his grandchildren, and his lands, excepting his homestead, to his children; the homestead was to be given to James Thornley, a son of Hugo and Mary Thornley. It was his intention to make disposition of his property during his lifetime, and deeds to the lands were actually made out, but had not been signed. The sons seem to have urged him to execute these deeds and let them into possession and enjoyment of their portion.

He had accumulated $3,400 in gold, which he regarded with a miserly affection, counting it over nearly every day.

On the 25th day of November, 1866, during a temporary absence of the father, and while the rest of the family were at church, as was said, this treasure was taken. The loss fell heavily on the old man, and he at once ascribed it to his son Samuel. The ill feeling continued between the father and his sons from this time until his death.

He served a notice upon them to leave his farm, and replevied some property that Samuel had taken into exclusive possession.

On the 3d of February this state of feeling culminated in the attempt on the part of Ralph Thornley to kill Samuel, and the infliction of a mortal wound by his own hand upon himself. It was while bleeding from this wound that he gave the bonds in dispute to Mary Thornley. The details of this transaction

are best gathered from the deposition of Samuel Thornley, who testified as follows: I am a son of Ralph Thornley, deceased; he was 80 years and 23 days old, according to his statement; he died February 13th, 1867; he left three children, Samuel and Hugo Thornley and Mrs. Betty Woods; there were two daughters who died leaving children—Ann and Sarah; Sarah Wagoner leaving two children, Ann Kershaw leaving one child; there were five heirs. Ralph Thornley had no will at the time of his death; he died from shooting himself on the 3d of February, 1867; I was present; it happened from eleven A. M. to one P. M. o'clock on Sunday; my brother and his wife and children and myself were in the room; I was reading a newspaper and my brother was lying on the bed with his head covered up, one of the children playing at his feet; Hugo was asleep; his wife, I suppose, was sitting near him; I was dozing over my paper; my father had been out somewhere; had gone out before I got up; he came in through the middle door and sat down by the hearth and then passed into his room and went and unbolted the front door, and then came and sat down behind me, and threw his hat to the little boy and told him to hang up his hat. The boy spoke to me and said, "Grandpa is going to shoot you," and just then I heard the shot and felt something on the back part of my head like the muzzle of a pistol; a ball was taken out of my head; here it is; he (father) ran out of the house, and some of the children said, "Grandpa was going toward the privy;" I did not follow him; I felt right faint, and in a few minutes he came back, apparently as strong as ever; he asked for a rag to lay on the floor so that he might not bloody the carpet; he called for a pan of water; he sat down; he put his hand in his pocket and took out a package and said: "Here, Mary, is eight thousand dollars." She made no reply. He repeated again the same. I told her, "take it, Mary, it is your just right;" then she took it; it was bloody; he was bleeding right smart; father was shot under his chin in the

neck; I can't say I heard a report of a pistol at the privy; he gave as a reason of the gift to Mary, that she had always done well by him, and it would do for her and the children; one child was a favorite of the old man.   Mary was married in 1855, and had ever since lived with the old man.   The shot did not affect me much at first; I afterwards felt a little faint, but saw everything as well as I do now.   This money was in bonds and notes.

To recover them, James Crum, the administrator of Ralph Thornley's estate, instituted proceedings in the county court. The fact of the gift was not denied, and the only question before the county court was, whether deceased was of sound mind at the time of the gift.

The county judge found that he was, and rendered a judgment against the administrator for costs.   An appeal was taken to the circuit court and a trial had, which resulted in a verdict for defendants, and thereupon this appeal was taken.

The errors assigned are, that the court below gave improper instructions; that proper evidence was refused, and for refusing a new trial, upon the ground that the finding of the jury was against the weight of evidence.

Mr. I. J. KETCHAM and Mr. H. E. DUMMER, for the appellant.

Mr. H. B. McCLURE, for the appellees.

Mr. CHIEF JUSTICE BREESE delivered the opinion of the Court.

The tragical circumstances in which this case has its origin, are fully detailed in the record, and are such as to shock the sensibilities of most persons, and induce a hasty inference that the doer of such deeds could not be otherwise than deranged.   It has, however, never yet been judicially determined that a felonious homicide, or an attempt to commit it,

is *per se* evidence of insanity, or an attempt at self-destruction either. History, and our own experience, teach us that the former is not unusual, and the latter of frequent occurrence, but they do not teach us that the one or the other is an evidence of an insane or deranged mind.

Various motives conspire to prompt the one, which are sometimes, susceptible of proof, while the other deed, death by his own hand, is, usually, an unfathomable mystery, hidden from human ken.

In this particular case, the motives of both deeds are apparent, by the cool, deliberate and intelligent statement of the suicide himself, made understandingly, while in the full possession of all his faculties, and with a perfect consciousness of the character of the acts done.

He was a very old man, near eighty-three years of age, of robust mind and frame, a veteran soldier of the illustrious Wellington in all the wars of the Peninsula, accustomed to blood and violence and indifferent to both, tired of life, avaricious and miserly, and at variance with his eldest son, who, he believed, had grievously wronged and robbed him of his hoarded gold which he loved so much to handle and count over; arbitrary and self-willed, unused, of late years, to any dictation, self-reliant, impatient and passionate, vindictive and God-defying, full credence may be given to his declaration that " he had got tired of living; that he could not die a natural death; that he wanted to take Samuel with him, and that he intended them as dead shots, and that he was sorry he had not made sure work of it."

Is such a declaration, from such a man, or the motives which it reveals, so unusual and unnatural as to be referable alone to an insane condition of mind? History is full of similar cases, and while men exist, uneducated, ferocious and brutal by nature, they may be often expected.

We have examined, with great care, all the testimony in this record, and cannot find the slightest evidence of an

unsound condition of mind, if the acts themselves, which were committed with so much deliberation, are not evidence of it. That they are, as we have already said, has not been judicially determined.

The great preponderance of the testimony fully establishes the soundness of the mind of the deceased on the day of the tragedy, and for near two days after it, when, owing to a fall, he was threatened with apoplexy, and remained in an insensible condition for more than ten days thereafter. His money had been stolen from him on the 25th of the preceding November, and, though it annoyed him exceedingly, made him very angry and garrulous on the subject, nothing is indicated from which the inference should be drawn that his mind was not perfectly sound, as much so as it could be in a man of his age. It is true, one physician, Dr. Van Pelt, who happened to be first called to see him after the attempt on his life, does say he was quite stupid until he gave him a stimulant. This was natural, as there was a pistol bullet lodged in the facial bones, his jaw bone broken, and he had bled profusely. But after the stimulant was administered he talked rationally on several subjects, and in reply to the doctor's question how he had done it, said, "was it not strange that one cannot always control his passions," and he further said he was only sorry "that it had not been complete." The next day, when the doctor made a professional visit, one of the family told him his patient had not taken the medicine he had left for him ; when told that Dr. Van Pelt had left the powders, he obstinately refused to take them. Different men might come to different conclusions as to this being evidence of insanity. This witness says, in talking, in December preceding, about some unsigned papers, and about the manner his sons were treating the property, and his perplexities generally, he would frequently drop off and talk about the loss of his gold, and then talk about politics, and about Jeff. Davis and Johnson's administration. Now we submit, if these be evidences of

insanity, what portion of the American people are now sane?

There is nothing in all this mass of testimony calculated to inspire the belief that the deceased was any other than a perfectly sane man, without the usual infirmities attendant upon his great age, and such was the opinion of his family physician, Doctor Dunlap.

We find the donor of these bonds was in a fit condition to make the gift of them to his daughter-in-law, Mary Thornley. That he made it understandingly at the time he placed them in her possession, and afterwards, with a full knowledge of what he had done, ratified and confirmed the gift.

Is there anything unnatural in this, when the circumstances are considered? He did not love his children with whom he was domiciled, but he did love Mary, his daughter-in-law. She had been his companion and nurse more than twelve years; she had four children, one of whom was a cripple, and another, the special favorite of the donor; is it then wonderful that he should say to her in his extremity, "Here, Mary, take these bonds and notes; there is eight thousand dollars; they are for you and your children," and delivered them to her, the envelope then wet with his own blood, as that was oozing from the self-inflicted wound, and Mary and the children around him, as we may well suppose, oppressed with grief, was it not a time and an occasion when all her kindness, for so many years, should come rushing back upon his memory, awakening the most generous emotions.

The law of the case upon the facts proved, was fairly and fully put to the jury by the instructions on both sides.

We have said, in the case of *Roe et al.* v. *Taylor*, 45 Ill., that a will made by a testator, in which, by some insane delusion of his, one of his children had been disinherited, that was a reason for invalidating the will. This was a case where a final disposition was being made of all the property of the testator, and to which, from all that appeared, the children

had the same or equal rights, if they can be said to have any rights whatever.

Here was no disposal of his property by the deceased, but a gift to a favorite child of a portion of it only, and to which the doctrine of that case cannot apply. These considerations present the instructions for the appellee in proper shape and on defensible ground.

It is complained by appellant, that the court rejected some proper testimony offered by him, tending to show the pecuniary circumstances of one of his grandchildren, the child of his deceased daughter, Mrs. Kershaw.

Appellant insists that one of the established tests of a sound and disposing mind is, whether, at the time of an act disposing of property, the validity of which is questioned, the mind of the party could and did appreciate his relation to the proper objects of his bounty, their pecuniary necessities and the effect of his acts in disposing of his property. This may be the doctrine in relation to a testamentary disposition of one's estate, but it is not the doctrine in regard to a single act, as a gift of an article. The inquiry would be legitimate if the controversy related to the last will, as we said in the case above referred to, but it can have no application to a gift which embraced not one-third of the estate. As to the two-thirds remaining, including all his lands, his heirs-at-law are entitled in equal proportions. Though he may have said he intended to give each of his grandchildren one thousand dollars, that should not restrain him from making a gift, though that might sensibly diminish the estate. It seems to us, the pecuniary condition of this grandchild was foreign to the controversy.

There being no error in the record, the judgment is affirmed

*Judgment affirmed.*

LAWRENCE, J., dissenting.