Argued May 25; affirmed December 31, 1932; rehearing
denied February 7, 1933

## In re EDWARDS' ESTATE

## EARLE v. SECURITY SAVINGS & TRUST CO. OF PORTLAND et al.

(17 P. (2d) 570)

*Nicholas Jaureguy* and *W. M. Cake,* both of Portland (Cake & Cake and Jaureguy & Tooze, all of Portland, on the brief), for appellant.

*Albert B. Ridgway* and *W. B. Shively,* both of Portland (Ridgway, Johnson & Kendall and Latourette & Latourette, all of Portland, on the brief), for respondents.

ROSSMAN, J. This is a controversy concerning the validity of the alleged will of Thomas Henry Edwards, executed February 21, 1929, in Portland, Ore-

gon. Edwards died September 16, 1929, in San Diego, California, aged 59 years. The will was presented for probate in common form to the circuit court (probate department) of Multnomah county, and was so admitted September 20, 1929. On September 15, 1930, Virginia Edwards Earle, then 25 years of age, the only child and sole heir of the deceased, instituted this proceeding for the purpose of setting aside the said will upon charges of fraud, undue influence and lack of testamentary capacity. The proponents of the will, after denying all of these charges, sought an order to have the will probated in solemn form. After an extended trial, the circuit court entered an order sustaining the will. The daughter appealed.

It is the contention of the contestant that on February 21, 1929, when Edwards prepared and executed his will, he either lacked testamentary capacity or was so mentally weak that he could not withstand the alleged wrongful conduct of Mary Edwards Longo, his sister, and Adolph G. Sieberts, an employee of the deceased. The contestant alleges that this wrongful conduct consisted of falsely representing to Edwards that the contestant no longer loved her father, that she had gone out of his life, and that the two individuals just mentioned were deserving of his bounty. She alleges that as a result of their improper actions Edwards inserted in his will provisions in their favor, and granted her a bequest of only $100 out of an estate which he deemed of a value of $460,000.

Let us first endeavor to gain an impression of Edwards during the years when his mental capacity was not questioned. He was born in Portland September 14, 1871, of Welsh and Irish parentage. His father, who had founded a retail furniture corporation, en-

titled the Edwards Company, is described by the evidence as a stubborn, determined, positive character. The son evidently inherited these qualities from his father, for many of the witnesses commented upon his strong will, his positive nature, his determination, and upon the futility of attempting to argue him out of his opinions. Mrs. Edwards, who divorced him August 31, 1927, testified: "He was very strong-minded, and I always let him have his way—his wish." Again she testified: "He was very positive * * * I couldn't change him." The daughter testified: "Father was very determined; when he made up his mind, it was certainly hard to change it for him. I don't know that I could say anyone ever changed his mind for him." His determination was born of his philosophy of life and the latter caused him to coin the maxim, "Never be doubtful, apologetic or fearful," which he commended to his daughter as a suitable maxim for her own guidance through life. Edwards never engaged in arguments. When anyone showed a disposition to want to argue with him he quietly walked away. When anyone over whom he possessed control opposed him he quickly terminated the situation by severing the relationship. While he was a man of strong likes and dislikes, he rarely gave evidence of his dislikes, and this element of his nature caused him to refrain from speaking ill concerning anyone.

Edwards was a well-educated man. The learning which he had acquired in a Montreal parochial institution and in Rensselaer Polytechnic Institute had been greatly augmented by constant reading. He was able to converse intelligently upon a variety of subjects and was wont to back up his statements by naming an authority or quoting from some favorite writer.

He always sought to excel, whether he was engaged in card playing, tennis playing, or business. He urged his daughter from her early youth to put her mind in working order and told her that when she had accomplished this difficult feat few people would be as fortunate as she, for, he said, "the satisfaction of doing things that other people cannot do is worth a lot." Edwards was more than a mere reader, he was a thinker. He declared, "I have found that if you want your thinking done by someone else you are going to be poor." Those who came into contact with him regarded him as a quiet, reserved, intelligent, well-informed business man.

Upon the death of Edwards' father, in December, 1913, Edwards inherited one-half of the corporate stock of the Edwards Company. A few years later he purchased the other half from his sister who was then Mary Edwards, and thereafter remained in the ownership of virtually all of the corporate stock until his death. In 1922 he began to spend much of his time in California. Until that year his daily routine brought him to his office in the store at approximately 8:00 a. m. where he remained until 10:00 a. m. He then disappeared and did not return until a few minutes before 5:00 p. m. The intervening hours he spent in athletics, conferences or reading. His theory was that an executive should not confine himself too closely to details. Beginning with 1922 he spent most of his time in California and operated his store through hired employees. His method of operation through the years proved so successful that, although stock in the company was worth only $50 a share when Edwards came into control, December, 1913, it was worth more than $250 a share at the time of his death. In the

meantime, the company had earned for Edwards a net profit of more than a half million dollars cash. Thus, this man's intellect and his ability to judge men had devised a plan where, largely through absentee management, he had been able to cope with his competitors and cause his business to prosper greatly.

In 1922 when Edwards went to California he sent the contestant, to whom we shall hereafter refer as Virginia, to Dana Hall, an educational institution in Massachusetts. She had previously graduated from St. Helen's Hall in Portland, and prior to that had had the benefit of a year's schooling in California. A year after entering Dana Hall she matriculated at Wellesley College. In 1927 she graduated from the latter institution. Each summer, while attending these institutions, she returned to the west coast where she was met by her father in California, and after spending some time in recreation, came north with him to the home in Portland. Edwards was exceptionally fond of his daughter, and one witness said he adored her.

During Virginia's stay in the east Edwards wrote her numerous letters. Several of these are in the record as exhibits. We have admired their beautiful literary style and have been impressed with the wholesome philosophy of life which the father endeavored to impart to his daughter in these letters. Virginia, in tribute to them, testified that she believed that no other girl had ever received from her father such a wonderful series of letters. In several of these he commended to his daughter's serious consideration marriage soon after graduation. He sought to point out to her how to choose a satisfactory husband, and declared that a woman's greatest happiness in life came from her children. He wrote to her, "Love is a

fever of youth, but a companion for the days of earthly existence is the real object of marriage.'' He urged her to so prepare herself that she would be a valuable helpmate for some good man.

While Edwards was in California, and up to the hour when he suffered the stroke of apoplexy that terminated his life, he wrote numerous letters to the manager of his store and to others in regard to his property and other business matters. All of these letters are terse, decisive, and reveal clear thinking.

We have now reached the year 1927, being the year in which Virginia graduated from Wellesley College, and have gained an impression of Edwards' characteristics, as well as an impression of his attitude towards Virginia. We shall mention one more item—Edwards had a hobby for drafting wills. Up to the month of September, 1926, he had executed seven such instruments. Since his estate was large, his beneficiaries many in number, and, since he always resorted to a trust so as to take the management of his estate out of the control of his wife, in whose business judgment he reposed no confidence, these wills were quite complex in their structure.

In and about the year of 1927 many events had their inception which we shall now mention because of their bearing upon the main event with which we are concerned—the preparation of the will of February 21, 1929.

Edwards' married life had never been happy. Seemingly, he found but little in Mrs. Edwards worthy of his admiration, and, since his nature was one which caused him to refrain from speaking ill concerning others, it is surprising to find that so frequently words

of criticism escaped him concerning Mrs. Edwards. In 1926 he began to urge his wife to obtain a divorce from him. She later filed a suit for divorce in the California courts and obtained an interlocutory decree August 31, 1927, and a final one September 22, 1928.

In February, 1926, he met in San Diego one Frances E. Murray, then 27 years old. Soon thereafter she sustained a relationship towards him which he termed that of a housekeeper. She claimed that the two had exchanged promises looking towards marriage. Edwards paid her a very substantial salary month by month for her services. In fact, the monthly wage was so great that it indicates that he rewarded something more than mere housekeeping service. Evidently Edwards received much companionship and pleasure from the presence of Mrs. Murray, but our conception of her can best be conveyed by use of the word ''adventuress.''

Approximately at the same time when Mrs. Edwards instituted her suit for divorce an attorney representing her began to negotiate with Edwards for a property settlement. March 9, 1927, an agreement was reached and the parties thereupon executed a written instrument contemplating a settlement of their property rights. Their agreement provided that Edwards should deposit with the Security Savings & Trust Company of Portland $90,000 in securities, the income from which should be distributed by paying Mrs. Edwards the sum of $300 per month during her lifetime, and Virginia the further sum of $100 per month. Upon the death of Mrs. Edwards the entire income was payable to Virginia. The latter was given control over the fund to the extent of permitting her to devise the *res* upon the death of the two. May 19,

1927, Edwards deposited with the trustee a large quantity of securities, but the trust did not become effective until November 1, 1928.

About the time when Mrs. Edwards obtained her decree of divorce the Edwards disposed of their Portland home, and he thereafter lived in apartments in San Diego and Portland, while Mrs. Edwards either traveled in the eastern states with Virginia or lived in an apartment in Los Angeles.

In 1927, as we have previously stated, Virginia graduated from Wellesley College and then came west for a visit with her parents. She testified that during this visit she told Mr. Edwards that she had become interested in a young Harvard College student, named Herbert Earle. She swore that she informed her father that they contemplated marriage some time in 1928. She also testified that she exacted from her father a promise that he would attend the wedding which she anticipated would be held on the west coast. However, since in another portion of her testimony she stated that she had not definitely accepted Mr. Earle's offer of marriage until shortly before the ceremony was held, she could not have spoken to her father in 1927 of the contemplated marriage as an assured event. The evidence indicates that Mr. Edwards did not understand that the wedding would occur for about two years. In the fall of 1927 Virginia returned to the East with her mother for the announced purpose of engaging in further study. Virginia testified that when she spoke to her father concerning her above plans he approved the contemplated marriage.

March 14, 1928, the wedding was held. At that time Mr. Earle was a special student at Harvard College. He should have graduated in 1927 when Virginia

did, but failed. He was now endeavoring, with the assistance of tutors, to qualify himself for admission into Harvard Law School. In order to be able to take care of Virginia, Mr. Earle effected an arrangement with his parents whereby they agreed to send him $300 a month until he should have achieved an earning capacity. This arrangement terminated a few months afterwards when the Earle family met with financial reverses. Edwards learned of the contemplated marriage and wrote Virginia a letter in which he expressed disapproval and withdrew his promise to attend the wedding. The reasons for his disapproval he clearly expressed in his letters and in conversation with two or three of his intimate friends. He disliked to see Virginia marry one who had not proven his worth. Mr. Earle, in an endeavor to reconcile Mr. Edwards to the marriage, wrote him a letter and received the following reply, dated April 3, 1928:

"Dear Mr. Earle:

"In reply to your letter, my opinion of the proposed marriage is as follows:

"The old-fashioned idea to which I hold is, that a man who has yet to demonstrate his ability to make his way in the world is not a desirable mate for an American young woman. He does not necessarily face a future of failure, but he does face a percentage in that respect, which should cause any parent with ordinary business judgment, to give warning to his daughter.

"It is known that such warnings are futile, and one who points out the truth is less well thought of when the truth does not fit the daughter's proposed plans.

"The man who gambles in business, and the woman who gambles in marriage, are in the same category. The world is full of people who prefer to 'take a chance' in the place of thinking, and they mostly wind up as a 'hard luck story.'

"Only recently have I found out how little higher education does to promote real ability to think correctly, so in my daughter's case I can only hope, and wish her good luck.

"Yours very sincerely,

"T. H. Edwards."

Unknown to Edwards the marriage had already taken place when the foregoing letter was written. The wedding announcement stated that the ceremony had been held May 14, 1928, and when Edwards died he still remained unaware that the wedding had actually taken place in February.

So strong was Edwards' opposition to the marriage that he not only refused to attend the wedding, and refused to meet Mr. Earle's parents when they took a trip to the west coast, but also refused to send a wedding present until his sister, Mrs. Longo, after much persuasion, convinced him that his failure to send a present would cause Virginia great embarrassment. He now refrained from writing to Virginia any further. Upon her visit to him in December, 1928, he told her that she would have done better to have married an iceman than this young man of unproven worth. To Mrs. Murray he described Mr. Earle as a numbskull. In the examinations following the marriage Mr. Earle again failed, but, finally, after applying to the University of Michigan Law School where he was able to gain special admission, transferred to the Harvard Law School, and, should he succeed in passing his various examinations, will graduate in 1933, five years after the marriage.

In September, 1927, and January, 1928, Mr. Edwards executed two more wills, both of which contained generous bequests for Virginia.

Let us now consider the condition of Mr. Edwards' health in this period of time. Edwards had been a firm believer in the beneficent effect of exercise and diet. He spent much time in swimming, playing tennis and handball. He was a frequent visitor at the seashore. These habits which he had acquired in his youth he retained to the end, and shortly before death overtook him he sent to a tennis association his check for his dues for the ensuing year. Tennis had been so dear to Edwards' heart that after his death some of his relatives became embroiled in a controversy of considerable proportions concerning one of his favorite racquets. He read many books on diet, and diet became one of his principal hobbies. He experimented with different items of food and in order to insure himself of a better understanding of their effects upon his system installed in his apartment a blood pressure testing machine. What he believed was good for himself he eagerly commended to others. Thus, he encouraged his employees to join athletic clubs, and assisted them by paying one-half of their membership fees. He also presented to his friends favorite books upon diet. He subscribed to the belief that ill health was one's own fault and carried this theory into effect by refusing to pay his employees wages during periods of their ill health, although he was extremely generous with them in many other ways.

According to Virginia, her mother and Mrs. Murray, Mr. Edwards' health began to show signs of failing in the year 1926. In that and subsequent years, according to the testimony of these witnesses, Edwards showed irritability and impatience at times. In the fall of 1928 he suffered an attack of what he termed "the

flu'' and in the course of his illness lost several pounds in weight.

Some time in 1928 Edwards apparently became convinced that he was in need of a medical examination. Accordingly, we find that November 8 to 24, 1928, he consulted for treatment an osteopathic physician, named Dr. J. D. Cunningham. November 22, 1928, April 17, 1929, and August 6, 1929, he received treatment and examinations from Dr. A. D. Butterfield. March 14, 1929, Dr. Frederick A. Speik, a diagnostician of Los Angeles, gave Edwards an examination, and February 20, 1929, Dr. Robert D. Forbes of Seattle gave him a cursory examination and advice. In October of 1928, and continuing until the time of his death, Edwards was receiving treatment from a male nurse in San Diego, named T. F. Patton—treatment of a kind which he testified was afforded in the Battle Creek Sanitarium.

It is very evident that Edwards had but slight confidence in physicians, and a circumstance which confirmed him in his ill opinion of them was the fact that their recommendations of what was needed to bring about recovery did not harmonize.

Let us now review the testimony of these physicians concerning Edwards' condition. Dr. Speik is a physician specializing in internal medicine. After having given Edwards an examination he persuaded him, against his will, to go to a hospital. After having stayed at the hospital for one night, and having evidently concluded that he would be subjected to an operation, he expressed to the nurse in charge a desire to leave. When his clothes were returned to him he left, after having arranged for payment of the hospital

charges. Later, Dr. Speik, in response to Edwards' request, sent him a full statement of his (Dr. Speik's) findings. A copy follows:

"Los Angeles, Calif., March 29, 1929.

Dear Mr. Edwards:

Your favor of March 26th is here, for which I thank you.

The following are the laboratory tests, X-ray reports, etc., of my recent examination of you:

Urinalysis—

Sp. gr. 1004. Acid. Trace of albumen, negative for sugar and casts, small amount of pus. Moderate amount of epithelial cells.

Blood—

R. B. C. 2,400,000. Leucocytes 8,800. Hemo. 40 per cent (Dare) Red cells thin—variation in size and shape. No abnormal reds seen.

Blood Chemistry—

| | | | |
|---|---|---|---|
| Urea | . | . | 24½ mg. |
| Creat. | . | . | 3 mg. |
| Sugar | . | . | 87— mg. |
| U. Nit. | . | . | 11¼ mg. |

Wasserman—

Negative.

X-Ray—

6-foot film of the chest shows a great deal of enlargement of the heart. There was a slight amount of haziness in both costa-diaphragmatic angles. There was also a slight increase in the hylus densities and the pari-bronchial markings.

Findings—

Enlargement of the heart;—probably some stasis in the lungs.

Physical Findings—

Pulse 90. Blood pressure 180-85.

Diagnosis—

Probable cancer of prostate. Secondary anaemia. Urinary retention. Vascular hypertension. Beginning anasarca.

You really are a pretty sick man and I trust you will seek further medical advice. I feel sure I could have helped you had you remained under my care.

Very truly yours,

F. A. Speik.''

In addition to exhibiting this report, Dr. Speik testified that he found Edwards ''a very sick man''; that he had ''fluid in his abdomen'' and an ''enlarged prostate.'' He also testified that Edwards' feet and ankles were swollen and that his breath was short. Although Dr. Speik, before consulting his office records, had testified that Edwards had chronic nephritis, an ailment of the kidneys which precedes chronic uremia, he withdrew that statement after he had consulted his office records. He then testified: ''The reaction was acid, a trace of albumen, no sugar and no casts, indicating no chronic nephritis.'' Dr. Speik testified that Edwards' swollen prostate gland prevented a normal emptying of the bladder and thus produced urinary retention. He was of the opinion that such a condition would affect the functioning of the mind. In a case like Edwards, he felt that the effect would operate against the exercise of sound judgment and cause the individual to reach unreasonable conclusions. He had not known Edwards before this visit and never saw him thereafter. Dr. Speik freely conceded that Edwards answered all of his questions intelligently and without difficulty. He added that Edwards knew what he was talking about. Dr. Speik seemed annoyed when Edwards left the hospital and seemed to feel that his failure to remain there for an operation was evidence of mental impairment. He conceded, however, that this was the only error which Edwards had committed within his observation. Dr. Butterfield made

a cursory examination of Edwards November 22, 1928, but "a more complete" one April 17, 1929. He found urinary retention and testified that such a condition makes the individual irritable, less acute mentally and that as it progresses the victim enters a condition of coma. He also found Edwards subject to a secondary anaemia which, he testified, would be likely to render Edwards less alert and less capable of exercising good judgment. According to his testimony, Edwards was slow of speech and of thought. We quote the following excerpts from Dr. Butterfield's testimony: "I don't think he was insane * * * I consider the man was developing toward uremia * * * he was rational." He added that Edwards was capable of thinking straight but was slow in making decisions, but that, having made a decision, he knew what he was doing. He also conceded that Edwards was capable of transacting ordinary business and that he talked coherently and logically. Dr. Cunningham, the osteopathic physician, treated Edwards for an enlarged prostate and for kidney and liver troubles. Apparently he and Edwards irritated one another, and evidently neither secured a favorable impression of the other. He testified: "He impressed me as suspicious of everyone—thought they were trying to do him. * * * He was irritable and very quick to say it didn't please him. * * * He was very decided." He did not notice any derangement in Edwards' mind but thought that at times Edwards was not himself. He found Edwards to be in moods which caused him at times to refrain from talking, while at other times he was more inclined towards conversation. Dr. Cunningham testified that an illness of the type with which he thought Edwards was afflicted would affect the clearness of a victim's mind, but that it never had occurred to him

that Edwards was demented. Dr. Forbes, a Seattle physician who bears an excellent reputation for skill, made nothing more than a cursory examination, but found nothing which suggested mental impairment. We come now to those physicians who had not known Mr. Edwards but who were called as experts to answer hypothetical questions. Dr. F. H. Dammasch of Portland, in the course of his testimony, recited a number of manifestations of chronic uremia scarcely any of which had been observed present in Edwards by his numerous acquaintances who testified. Dr. Dammasch testified that uremia is the result of chronic nephritis, and yet, as will be observed from Dr. Speik's testimony, Edwards was not afflicted with that ailment. He also assumed that Edwards had general arteriosclerosis, secondary anaemia, general anasarca and chronic uremia. By turning to Dr. Speik's report it will be observed that he makes no mention of general arteriosclerosis and general anasarca. We reject this witness's opinion that Edwards' mind was impaired, and that he was an easy object of influence as ill founded. Dr. D. C. Burkes, another medical expert, called by the contestant, testified that Edwards did not have "a true or a frank psychosis, that is, true insanity." Again, he testified: "I didn't say that there was a mental impairment. I said there could most likely be, and that an anaemic brain would not function in its normal manner." We quote further: "I don't think the man was truly insane; that he was mentally incompetent * * * but I think the man was sick, his brain was tired." We quote further: "I think Mr. Edwards knew what he was doing when he made his will"; but modified this statement by adding that Edwards was sick and was laboring under emotional distress. Manifestly, since the witness had never

known Edwards, the latter remark was without foundation in fact. He also testified that Edwards' mind was fully capable of understanding his various pieces of property and of contemplating those who were entitled to his bounty. As the examination progressed the witness was shown various of Edwards' letters and, when pressed for a declaration concerning the mental qualities which would enable an individual to write such instruments, declared: "I have never questioned Mr. Edwards' business ability." His testimony indicates strongly that in arriving at his conclusions he assumed that Edwards was suffering from hardened arteries of the brain and that Edwards' failure to make a more generous bequest to his daughter in his will was an item of great magnitude. After being questioned at some length concerning the basis for his conclusion that Edwards was not mentally himself when he prepared his will, he declared: "That is my opinion, my unqualified opinion, and I still believe it, and I shall continue to believe it in the face of facts." Which confirms the opinion ofttimes held concerning expert witnesses, that even facts do not change their opinions.

Virtually all of the witnesses whom we have mentioned freely conceded that some individuals withstand the progress of a disease more successfully than others, and that one with a high resistive power will be capable of retaining his mental powers unimpaired where another with a less positive nature would display evidence of mental impairment. These witnesses, or at least a part of them, conceded that secondary anaemia affects the quantity but not the quality of the victim's work. Dr. A. E. Mackay, a Portland physician who specializes in urology, that is, diseases of the kidneys

and bladder, testified that he yearly treats more than 100 patients suffering from prostatic ailments. We quote from his testimony:

"Q. What is your experience, Dr. Mackay, with reference to prostatic troubles as a cause of mental disorders and mental impairment? A. Well, it is very, very seldom that I meet an old prostatic, even an advanced age prostatic, unless they are extremely uremic, that I find they are not quite capable of doing their business and carrying on business, and being quite bright brained.

"Q. What do you mean by 'extremely advanced?' A. Where they are confined to their bed, where they are dull brained, do not answer questions intelligently, and are very, very sick.

"Q. Now, does the urea content of the blood have any effect on mental impairment? A. Not unless it would be very high, showing profound toxemia.

"Q. What do you mean by 'very high?' A. Of what?

"Q. Very high urea content; what would you call a very high urea content? A. Well, the urea content would have to be, oh, possibly 35 or 40. I pay more attention to the urea nitrogen in laboratory tests.

"Q. What would have to be the count, or what would have to be the urea nitrogen content before you would say it would have any effect on the mind? A. That would have to be 20, 25, 30; a high urea nitrogen test.

"Q. If a man has a normal urea nitrogen content, would that have any effect on his mind? A. No.

"Q. Now, what is your experience with reference to high blood pressure and mental impairment? Is there any connection between the two? A. Not that I ever found out; most of these old prostatics have high blood pressure.

"Q. Now, what is the normal content of urea nitrogen in the blood? A. Oh, 12 to 15 milligrams per C. C.

"Q. If it should be shown that the patient whom we have been discussing had a urea nitrogen content of 11 and a half milligrams, what would you say? A. That would be within easy normal limits.

"Q. Easy normal limits? A. Yes; nothing out of the way.

"Q. Is there anything else in this statement of symptoms which we have given you which would, in your opinion, affect his red cell count, beside the diet and the urinary retention? A. No, not particularly, except his prostatic condition.

"Q. Now, taking up the urine test; among the symptoms we gave you, it was determined—it was shown, rather, that the reaction of the urine was acid; is that normal or otherwise? A. Well, that—urine usually is normally acid."

Dr. George A. Cathey, who confines his practice to brain and neurological surgery, testified:

"Q. Now, what is the normal amount of urea nitrogen? A. It runs from 10 to 15—10 to 13; it varies.

"Q. Then, if it develops that Mr. Edwards' urea nitrogen from a blood analysis was eleven and a half, would you say that was within the normal area? A. Yes, sir.

"Q. Well, then, based upon your analysis of Doctor Speik's blood analysis, in turn, what conclusion do you draw as to the possibility of Edwards having suffered from chronic uremia? A. It is absolutely inconsistent, because a person would not have uremia of any form without a retention in the blood of a high increase of urea, and it will go up as high as a hundred of urea in the blood before a person will show any signs of uremia; and in the definite signs of uremia, it goes as high as 150, and in the marked type it is as high as three, per cubic centimeter of blood.

"Q. As against twenty-four and a half in Mr. Edwards' blood analysis? A. Yes, sir."

Both Dr. Mackay and Dr. Cathey, after being shown Dr. Speik's report, testified that nothing contained within it indicated that Mr. Edwards' mental qualities were impaired.

The only witness who testified directly that Edwards was afflicted with uremic poisoning was the aforementioned T. F. Patton, a male nurse, who operates a sanitarium in San Diego to which Edwards had resorted for treatment. He was not a physician and Dr. Butterfield, under whom Patton had secured his training, testified that Patton was not qualified to express an opinion upon such a complex problem. Patton, however, stated that while Edwards' illness made him "dopey" or "drowsy" at times it did not impair his mind, and that Edwards was at all times alert, intelligent, positive and interesting in conversation. He testified that he had advised with Edwards in regard to investments and the development of his own sanitarium. He protested emphatically that he had observed nothing about Edwards indicating mental impairment, although he had come in contact with Edwards almost daily for approximately a year's time. He also declared that his treatments whereby Edwards was relieved of his urinary retention greatly benefited Edwards and that this benefit was particularly manifest in April, 1929, and the following months.

From the foregoing we believe it is manifest that Edwards was not afflicted with chronic nephritis nor with chronic uremia. Yet those two alleged ailments are, to a substantial extent, the very foundation of the contestant's attack upon Edwards' mental capacity. It will also be observed that Dr. Speik's report makes no mention of general arteriosclerosis, nor of general anasarca. As a witness, Dr. Speik left the impression that possibly Edwards was suffering from a "wet brain." More than one of the medical witnesses testified that no examining physician would permit a wet brain to remain a matter of doubt, for medical instruments are capable of proving or disproving conclu-

sively such a condition in a patient. Witnesses also testified that no one could live for several months with a wet brain. Hence, we cast out this supposed ailment as one that Edwards did not possess. Mrs. Murray testified that in the latter part of 1928 Edwards was severely bloated, and that this condition was so serious in his legs that his trouser legs, although large, in conformity to the prevailing style, were completely filled. This is the young woman who was serving Edwards as housekeeper, under a salary arrangement much larger than that ordinarily paid for such services. The transcript of evidence indicates that she frequently hesitated while under examination and more than 200 times replied that she could not remember. Immediately following Edwards' death she abandoned the mourners and hurried to a safety deposit vault where she made a search for his will. Later, when others had found that instrument and Mrs. Murray had read it, she was grievously disappointed with her bequest, and, in a spasm of hysterics, burst into tears, protesting that she would never again do anything for any man. Before testifying for the contestant she exacted a written promise that, in the event the contestant prevailed, she would receive everything granted to her by the will. These circumstances seriously discredit this witness, in our estimation, and our ill opinion of her is confirmed by an item of evidence which we now shall mention. In November, 1928, when Mrs. Murray claims that Edwards' body was badly swollen with fluids and his trouser legs filled from the ill effects of a dropsical condition, she and some friends took several photographs of Edwards. She also mentioned him in a letter. Neither the letter nor the photographs support her present claim. To the contrary the photographs represent a man with keen eyes, erect, and apparently

physically fit. This she admitted by writing on the reverse side of one, "Isn't this just like Mr. Edwards?" before mailing it to one of Edwards' relatives. No swelling nor crowded trouser legs are indicated in any of these photographs.

Without reviewing further the aforementioned portion of the evidence, we state our opinion that the medical testimony indicates that Edwards was afflicted with an enlarged prostate gland, beginning anasarca, secondary anaemia, and some hardening of the arteries. It also indicates that his condition might diminish the quantity of his work, physical or mental, but not the quality. We pause to take note of the fact that in December, 1928, when his condition was supposedly at its worst, he drove alone his automobile from San Diego to Los Angeles in the early hours of the morning and met with no difficulties.

We come now to approximately 80 witnesses who saw Edwards in the latter part of 1928 and during the nine months of 1929 which preceded his death. These witnesses testified to the extent of their acquaintanceship with him and their observations concerning his mental capacity. We shall review briefly the testimony of a few of these. T. O. Bird is a Portland real estate agent who, in 1928-1929, was conducting negotiations for the sale of a valuable piece of Portland property owned by Edwards. He saw Edwards in February, 1929, and noticed no evidence of mental impairment. To the contrary, he was impressed with the manner in which Edwards analyzed the proposed transaction. B. H. Bowe, the subscribing witness to Edwards' will, saw no evidence of mental derangement. J. King Bryon, the managing director of the Furniture Dealers Association, conferred with Edwards in February, 1929, concerning bills pending in the Oregon legisla-

ture. He was impressed with Edwards' grasp of the situation and saw no change in the keen, analytical mind which he had always noticed that Edwards possessed. Blain B. Coles, vice president of the Security Savings & Trust Company, received in February, 1929, delivery of Edwards' will. He saw no change in Edwards' condition. He, together with many other of the witnesses, believed that Edwards' ability was above the average. Bessie F. Colwell was the public stenographer to whom Edwards dictated, unassisted, the will which we shall later quote. She testified that he "dictated in a very calm, efficient way" and that he "dictated especially well." She had known Edwards for many years and found him in February, 1929, as "sound in mind as you or I." Frederick W. Davis had been an intimate friend of Edwards for 25 years, and at the time in question was one of the employees of the store, but not a beneficiary under the will. He saw Edwards both in February, 1929, and in June, 1929, and testified: "I never found any difference in his mental condition," which he declared was always excellent. Charles E. Dye, vice president of the Furniture Corporation of America, and an old friend of Edwards, held an extended conversation with him in February, 1929, concerning a merger of the leading retail furniture stores of the west coast. Since he found Edwards' mind as bright then as ever before, the witness declared: "I did not think of his mental condition; it did not occur to me." We have already mentioned Dr. Robert D. Forbes of Seattle. He testified that Edwards "had a very keen mind * * * showed a mental alertness and a very quick understanding." He saw no suggestion of mental impairment. B. Gildner, an extensive owner of Portland property, and a friend of Edwards for 40 years, saw him in 1929 and played

cards with him several times upon that visit of Edwards to Portland. Edwards' card playing ability which, in the witness' estimation, was always excellent had suffered no impairment, nor had his mind. Homer Goehler, secretary of the Powers Furniture Company of Portland, discussed with Edwards February, 1929, the proposed furniture merger previously mentioned. He found Edwards "the same as he always was, very keen." He discovered no indications of mental impairment. Harry A. Green, president of the Doernbecher Furniture Company, discussed with Edwards, in company with the aforementioned Clark E. Dye, the contemplated furniture merger. He swore: "His mind was just as keen as it always had been" and described Edwards' conversation thus: "Conversation was exceptionally intelligent along business lines." Herbert Greenland, a Portland tailor, who had known Edwards for 35 years, made a suit for him upon his visit to Portland in February, 1929. He saw no change in Edwards' mind which he described as "above the average." Charles S. Hall, an employee of a San Diego Public Service Company, saw Edwards frequently in 1929 and found him an especially capable card player. He had no doubt of Edwards' mental capacity. Earl Hamilton, an employee of the Edwards Company since 1922, saw Edwards in February, 1929, and noticed no indications of mental impairment. Edgar O. Hodge, vice president of a San Diego bank, knew Edwards for approximately five years and saw him in December, 1928, and also in 1929. In the latter year Edwards borrowed at Hodge's bank several sums of money, including one item of $18,000. The witness knew of no indications of mental impairment. Harry W. Johnson, an employee of the Edwards Company, who was not a beneficiary under the will, met Edwards

in February, 1929, and, at his request, installed a radio receiving set in his apartment. He saw no change in the keenness of Edwards' mind. A. E. Kern, a Portland printer, who had known Edwards for 40 years, conversed with him several times in February, 1929, and again in June, 1929. The two discussed a wide variety of subjects, including wills, the handling of employees, financial investments, trust, and business conditions. Mr. Kern testified: ''I thought he was keener, if anything. * * * I really got a better impression of his ability than I ever did before. * * * His mind was absolutely clear.'' Winnie Landes, an employee of the Edwards Company since 1922, saw Edwards in February, 1929, and in July, 1929. In each instance she saw him busying himself with the affairs of the Edwards Company, conferring with employees and salesmen of securities. She testified: ''His mental condition was always one hundred per cent in my opinion.'' J. H. MacKenzie, a wholesale hardware dealer of Portland, who had known Edwards since 1905 when the two played handball together, saw him in February, 1929. Edwards spoke of his interest in his employees and of his satisfaction with the manner in which the Edwards Company was being conducted. The witness observed no mental impairment and declared: ''If he had been I would have noticed it because he talked very rationally to me.'' Eugene Martin, owner of a San Diego automobile agency, had an extended conversation with Edwards in March, 1929, concerning the rebuilding of Edwards' automobile. He declared; ''if he was crazy, I would like to be crazy like he was,'' and then commented upon Edwards' keen mind. Homer D. Peabody, an employee of a securities company, met Edwards a number of times in 1929. He found him a very inter-

esting conversationalist and well informed in regard to investments. He testified: "His reasoning was very sound." After having testified that Edwards had refused to purchase stocks in 1929 because they were too high-priced, he declared that he regretted that he had not followed Edwards' example. After indicating that Edwards, therefore, saw the severe deflation that began about the middle of 1929, the witness testified: "I think he was a wiser bird than most of us thought he was." Robert Pelouze, a Portland dealer in securities, talked to Edwards in February and in June, 1929, without discovering any evidence of mental impairment. Paul A. Scott, an employee of the Edwards Company, testified that upon Edwards' visit to Portland in February, 1929, Edwards busied himself with an examination of the books. He saw no evidence of mental impairment. William George Sherfese, a San Diego automobile salesman, discussed with Edwards May, 1929, the sale of an automobile. He declared: "I thought he was very capable; he seemed to know exactly what he wanted." George H. Stafford, a member of the Elks lodge of San Diego, like several of the other witnesses, described Edwards' card playing ability. One of Edwards' favorite games was panguingi, which is played with eight decks of cards and requires acute concentration. These witnesses, like all of the others who had played with Edwards, described him as a very capable and successful card player. His ability in card playing did not diminish in the year 1929. Paul Steinmetz, a Portland merchant, talked with Edwards in February and in June, 1929, and noticed no mental impairment. Lee C. Stidd, manager of a Portland Savings and Loan Association, had known Edwards since 1918. In February, 1929, he twice discussed some business matters with him and

found his mind as clear and strong as at any previous time. "He was just as positive, just as sure of himself" as ever. Robert H. Strong, head of a Portland trust company, and who had known Edwards for more than a score of years, had an extended discussion with him in February, 1929, concerning the operation of trusts. He found Edwards' mind as alert and capable as ever before. Elwood Wiles, a real estate dealer of Portland, who had known Edwards for 25 years, discussed with him in February, 1929, the sale of Edwards' furniture business. He found Edwards "fully capable of taking care of his own business" and no evidence of a change in his mental make-up. John Oliver Wyatt, a San Diego dealer in investments, discussed with Edwards investments in February, 1929, and declared: "It was an education to me to get to talk to Mr. Edwards." He found Edwards' mind clear and shrewd. The testimony of other witnesses could be reviewed to similar effect. Their occupations were various and their opportunities for making observations were as good as those whom we have already mentioned. All of them agreed that Edwards' mind had lost none of its capacity for clear thinking. They all found him an agreeable individual. Many of them were evidently amused when they were asked whether they had observed any indications of a diminishing of Edwards' mental capacity and gave evidence of their astonishment by emphatic replies in the negative. A total of 82 witnesses expressed opinions concerning Edwards' mental condition. Only five opinions were adverse. We have previously indicated their nature and source. We shall not spend further time upon this opinion-evidence.

Edwards' conduct in February of 1929 is enlightening. February 10 to 26, 1929, he journeyed alone from San Diego to Portland, then on to Seattle and back to Portland, and thence to San Diego. In the same month he held numerous conversations and gave five of his friends helpful advice. One of these, a Mr. Davis, inquired concerning a proposed attack upon Davis' mother's will. Edwards advised strongly against such a course of action. In February Edwards wrote several letters, all of which are in the record, and certainly give no evidence of impaired mental capacity. He conferred with business associates concerning real estate, the proposed furniture merger, and the creation of a trust. He played cards both in San Diego and in Portland and impressed the other players with his ability. He recognized old friends upon the streets and gave none of them any impression of impaired mental vigor. He spoke to his Portland managers concerning the conduct of his store, suggesting an increase in pay for a faithful employee. February 1, he wrote a letter, well composed, thanking Mr. Sieberts for the excellent volume of business in the past year, and enclosed his check for $1,000 as a token of appreciation. In the same month he checked the records of the Edwards Company, called attention to an instance of poor salesmanship, wrote an article for The Cooperator, the house organ of the Edwards Company, discussed the threat of chain stores, inquired concerning a law suit then pending, and conferred with his Portland managers concerning a reduction in the capital investment of the Edwards Company. In the same month he conferred with some stock and bond salesmen, made an inventory of the contents of his Portland vault, bought some securities and arranged for their

delivery to him in Portland without expense. He also made several entries in his private books of account, showing expenses of operation and cost to himself of securities. In the same month he ordered delivery of a radio receiving set in his Portland apartment, called upon Dr. Forbes of Seattle for medical advice, learned from Mr. Patton, the San Diego nurse, how to take care of himself while upon his trip north, had a tailor make for him a suit of clothes, and checked over the records of one of the employees of the Edwards Company who was keeping Edwards' private set of books. While all of Edwards' books, writings and other entries are a part of the records in this proceeding, nowhere has there been discovered a single error or a notation indicating lack of mental capacity or of poise.

We come now to February 21, 1929. Upon that day, pursuant to appointment, Edwards entered the office of Bessie F. Colwell, a public stenographer, and proceeded to prepare the will which is now under attack. He brought with him a previous will and indicated to Mrs. Colwell the parts of that instrument which he desired to incorporate into the new one. The parts retained were approximately one-half and were items scattered throughout the instrument. The balance he dictated from a few notes which he had in his possession. After his dictation had been completed he made his trip to Seattle where he visited at the home of Mary E. Longo, his sister, for a few hours less than two days. During that visit he also called upon Dr. Forbes whom we have previously mentioned. At the conclusion of the visit he returned to Portland and again called upon Mrs. Colwell. After spending an hour carefully reading the instrument as she had typed it he signed it without making any alterations in it

whatever. The mental ability required to dictate such a complicated instrument is such that we now set forth a copy of the will as an indication of Edwards' mental capacity, February 21, 1929:

## LAST WILL AND TESTAMENT

OF

## THOMAS HENRY EDWARDS

I, Thomas Henry Edwards, of the City of Portland, County of Multnomah, State of Oregon, being of sound and disposing mind and memory, and not acting under duress, menace, fraud or undue influence of any person whomsoever, do make, publish and declare this my Last Will and Testament, and I do hereby expressly revoke all other and former Wills and Codicils to Wills made by me.

### ARTICLE I.

I direct my executors hereinafter named to pay all my just debts and obligations, including the expenses of my last sickness, as soon after my decease as is practicable.

### ARTICLE II.

I do hereby give, devise and bequeath to Laura V. Edwards and Martha Virginia Edwards and to each of them the sum of One Hundred Dollars ($100.00).

### ARTICLE III.

I do hereby give, devise and bequeath to Frances E. Murray, of San Diego, California, one Packard Coupe and such personal belongings as I may have in my apartment in San Diego, including radio, watch, etc.

### ARTICLE IV.

I do hereby give, devise and bequeath to the Security Savings & Trust Company of Portland, Oregon, a corporation duly organized under the laws of the State of Oregon, and to its successors and assigns (subject

nevertheless to the provisions and conditions hereinafter set out), all of the rest, residue and remainder of my estate, real, personal and mixed, wheresoever situate, of which I may die seized or possessed or to which I may be entitled at the time of my decease in trust, nevertheless, to and for the uses and purposes hereinafter specified as follows, to-wit:

All of the trust estate funds created by this Article of my Will shall be paid and delivered by my said executors as soon as practicable after my decease to the said Security Savings & Trust Company, as Trustee, to be managed, invested and finally distributed for the benefit of the beneficiaries hereinafter named, who will share in the income, residue and remainder as hereinafter provided.

The said Trust Company, as trustee, shall keep the said trust fund safely and securely invested, and said trustee shall be the sole and final judge as to the character of securities it may select for investing the funds of the estate, excepting as hereinafter provided, and is hereby released from any statutory restrictions as to the character of its investments in this case.

Said trustee shall have power and authority to sell any of the real and personal property held in trust under this Will, either at public or private sale, with or without notice and without any order of sale and without confirmation of any Court, and upon such terms as it may in its discretion deem advisable.

## ARTICLE V.

The Trustee shall be bound to observe the following instructions in handling this estate.

(a) It must not invest more than five per cent (5 per cent) of the capital of the trust fund in any single investment and in stocks and/or bonds of any corporation or company.

(b) The Trustee shall diversify the investment of funds as is customary with careful and experienced investors.

(c) The Trustee may not invest any of these funds in any security issued by a corporation which may be a debtor to said trustee. The trustee shall not invest any of this trust money in any securities which it may issue or from which it may derive any benefit.

It is my wish and advice that the trustee operate and continue the furniture business of Edwards Company for a period of at least ten (10) years or as long as Mr. Adolph G. Sieberts' services shall be available to manage it. However, if said Sieberts finds conditions unfavorable and if he cannot earn and pay an annual average of six (6) per cent on the investment, to the trustee, then the business shall be closed out and the capital otherwise invested. My experience with said Sieberts has been that he is an honest and competent manager. If at any time he shall advise the trustee to close out the business the trustee shall agree with him and allow him to dispose of it on terms and in such manner as the trustee may approve, but the trustee shall not order the sale of the business on terms or in any manner that said Sieberts does not approve of. In the event of Sieberts' withdrawal the trustee shall liquidate the company within two years. The trustee shall collect the income from the investment and shall make payment to the beneficiaries hereinafter named in amount annually of not less than five (5) per cent of the appraised value of this estate. These payments shall be made quarterly.

It shall keep books of account showing all transactions relating to the trust funds under this Will and shall furnish each beneficiary (interest in any trust) annually a statement of the affairs of the estate, showing the results of its management, securities on hand, purchases, sales and profits or loss during the period.

The object of this Will is primarily to create and maintain a periodical income to the individual beneficiaries and the trusts created by this Will for individual beneficiaries are made for the purpose of providing a suitable support and maintenance for such respective individual beneficiaries, and such beneficiaries shall have no power to anticipate or assign the

income which shall be payable to them respectively under the provisions of this Will, and such income shall not be liable to be taken away from any such beneficiary by process of law or otherwise.

### Article VI.

To the beneficiaries I give and bequeath as follows:

1. I direct my trustee to pay to the Sisters of Mercy of Oregon, for the use and benefit of Mount St. Joseph's Home for the Aged, located at East 30th and East Stark Streets, Portland, Oregon, one-twentieth (1/20) of the net income of my trust estate, to be paid to it by my trustee as hereinbefore provided, until final termination of this trust.

2. I direct my trustee to pay to the Sisters of the Holy Name of Jesus and Mary, for the use and benefit of Christie Orphans Home, located at Oswego, Oregon, one-twentieth (1/20) of the net income of my trust estate, to be paid to it by my trustee as hereinbefore provided until final termination of this trust.

3. I direct my trustee to pay to Albert H. Herndobler, of Portland, Oregon, two-twentieths (2/20) of the net income of my trust estate for the term of his life, and upon his death, the said two-twentieths (2/20) of the net income of my trust estate, I direct my trustee to pay to his wife for her natural life, if she survive him, and upon the death of both Albert H. Herndobler and his wife, I direct my trustee to pay two-twentieths (2/20) of the net income of my trust estate unto such of their children and the survivor of them as were born before January 1, 1928, equally for their natural life.

4. I direct my trustee to pay to Adolph G. Sieberts, of Portland, Oregon, five-twentieths (5/20) of the net income of my trust estate for the term of his life, and upon his death, the said five-twentieths (5/20) of the net income of my trust estate, I direct my trustee to pay to his wife, for her natural life, if she survive him, and upon the death of both Adolph G. Sieberts and his wife, I direct my trustee to pay five-twentieths (5/20) of the net income of my trust estate unto such of

their children and the survivor of them as were born before January 1, 1928, equally for their natural life.

5. I direct my trustee to pay to my sister, Mary Edwards Longo, five-twentieths (5/20) of the net income of my trust estate for the term of her life. To Ann Elizabeth Whiting, my niece, for the term of her life, in case she should survive Mary Edwards Longo, her mother, five-twentieths (5/20) of the net income of my trust estate from and after the death of her mother, Mary Edwards Longo. In case Ann Elizabeth Whiting should die before the closing of this trust and should leave heirs of her body, the five-twentieths of the net income of my trust estate which she would have taken if she had survived my sister, Mary Edwards Longo, I direct my trustee to pay to the heirs of her body and the survivor of them from the date of her death until the termination of this trust, equally and share and share alike. In case Ann Elizabeth Whiting should not survive Mary Edwards Longo and should not leave heirs of her body, then said five-twentieths (5/20) of my net income shall revert to my trust estate.

6. I give and bequeath unto Lauretta C. Schultz, one-twentieth (1/20) of the income of my trust estate for the term of her life.

7. I give and bequeath unto Elaine Hamblin, one-twentieth (1/20) of the income of my trust estate until such time as she married, when this bequest shall cease.

8. I give and bequeath unto Frances E. Murray, of San Diego, California, one-twentieth (1/20) of the net income of my trust estate until she marries, when this bequest shall cease.

9. I give and bequeath to Sanford Whiting, Jr., son of the late husband of my sister, one-twentieth (1/20) of the net income of my estate for the period of his life.

10. I give and bequeath to Winnie Landis, book-keeper for Edwards Company, one-twentieth (1/20) of the net income of my trust estate for the period of her natural life, but only as long as she remains unmarried.

11. I give and bequeath to William Tilke, Truck Driver for Edwards Company, one-fortieth (1/40) of the net income of my trust estate for the period of his life.

12. I give and bequeath to James Day, Finisher for Edwards Company, one-fortieth (1/40) of the net income of my trust estate for the period of his life.

I direct that the inheritance tax becoming payable to the United States and/or any State on account of any bequest herein made shall be paid by my executors or my trustee and the amount so paid deducted from the amount of each bequest herein made.

It shall be optional with the trustee to allow the repayment to the estate for tax money over a reasonable period, charging interest against the advance, so that the beneficiary may not be called on to pay a larger lump sum than is convenient or available.

13. Upon the death or disqualification of any beneficiary, leaving unappropriated a portion of the income, the amount payable to each of the others shall be increased. The shares of the remaining beneficiaries shall be determined by dividing the unappropriated sum into a number of parts equal to the added total of the numerators of the fractional parts of those remaining living. Then each shall receive as many parts of the unappropriated income as is designated by the numerators of his or her fractional share of the original distribution. Example: If Frances E. Murray dies first, then one-twentieth (1/20) of the income will be unappropriated. This amount shall be divided into nineteen (19) parts of which Mary Edwards Longo will receive five (5) parts, A. E. Sieberts five (5) parts, etc.

### ARTICLE VII.

Upon final termination of this trust, I give, bequeath and devise as follows:

1. I give, bequeath and devise to the Sisters of Mercy, for the use and benefit of Mount St. Joseph's Home for the Aged, five (5) per cent of the residue and remainder of my trust estate to be held by it absolutely and forever.

2. I give, bequeath and devise to the Sisters of the Holy Name of Jesus and Mary for the use and benefit of Christie Orphans Home, five per cent of the residue of my trust estate to be held by it absolutely and forever.

3. I give, devise and bequeath unto the heirs and/or devisees of Ann Elizabeth Whiting, the whole residue of my trust estate at the final termination of this trust, to be held by them absolutely and forever.

### ARTICLE VIII.

I hereby nominate and appoint Adolph G. Sieberts and Albert H. Herndobler to be executors of this my Last Will and Testament and hereby direct that each be required to furnish a bond as such in the sum of Ten Thousand Dollars ($10,000.00).

### ARTICLE IX.

Inasmuch as I have made a bequest to each of said executors, no executors' fees shall be allowed to them, said bequests being in lieu of said executors' fees.

### ARTICLE X.

I hereby direct, and it is my wish, that no bond or undertaking be required of my trustee upon qualifying as such, or at any time during the administration of my estate.

### ARTICLE XI.

This trust and Trusteeship shall continue until the death of the last survivor of the following named individuals: Frances E. Murray, Mary Edwards Longo, Ann Elizabeth Whiting, Lauretta C. Schultz, Elaine Hamblin, Albert H. Herndobler and his wife, and the heirs of her body born prior to January 1, 1928, and Adolph G. Sieberts and his wife, and the heirs of her body as were born prior to January 1, 1928, at which time this trust shall cease and determine and the entire trust estate shall be conveyed, transferred and delivered and distributed by my said trustee as in this my Will provided.

## Article XII.

The funds of this trust shall be ultimately invested in stocks and bonds. A minimum of thirty (30) per cent and not more than forty (40) per cent of said capital shall be invested in bonds, and the balance in common stocks and/or preferred stock, but not more than ten (10) per cent at any time in preferred stock.

In choosing stocks it shall be the purpose of the trustee to enable this estate to share in the future growth and prosperity of the country by making it a point to share ownership in the great representative industries of the country. To this end I hope that the trustee will select stock of the corporations which are dominant or representative of their line of endeavor and whose previous record and progress indicates sound and far-sighted management. The trustee shall keep in mind the fact that no individual stock or bond is an investment and that safety can be obtained only by following the rules of insurance which I summarize as follows:

Insurance inspects every risk offered—accepts only good risks.

Examines accepted risks regularly, eliminating the poor ones.

Takes only small stakes in many risks, widely distributed.

Owns only bonds and stocks of leading companies in sound and essential industries.

Except for bank and insurance stock owns only stocks represented on one of the larger exchanges.

Owns only stock which can boast an unbroken earning, as well as dividend record for at least ten years.

Owns stock in at least five different industries.

Owns stock in fairly equal amount in at least fifteen different companies.

Owns a few low yield stocks in future companies as means of building up capital and future income.

ARTICLE XIII.

In the event that the trustee shall be unsuccessful in the management of the estate to the extent that the capital shall have been lost in unfortunate investment to the extent of more than ten (10) per cent, it is my desire that the beneficiaries holding as much as fifty (50) per cent interest in the income provided may appeal to a court having jurisdiction for it to change the trustee, or the trustee and beneficiaries may agree among themselves to transfer the trust to a thoroughly responsible company with ample capital.

Furthermore, in the event the trustee corporation be absorbed by some other corporation and the beneficiaries do not approve of the new trustee, the right is reserved to the beneficiaries, if seventy-five (75) per cent of them will agree among themselves, to transfer the trust to some other competent and satisfactory trustee.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal at the City of Portland, in Multnomah County, State of Oregon, this 21st day of Feby., 1929.

(Signed) THOMAS H. EDWARDS (SEAL)
(Signed) THOMAS HENRY EDWARDS (SEAL)

Without commenting further, we express our opinion that on February 21, 1929, Edwards' mind was not impaired in its testamentary capacity. But the contestant urges that in 1928 and 1929 he was subject to delusions concerning her. We have read the numerous letters which she and he exchanged, and also the extensive recitals in the transcript of evidence wherein the witnesses described the relationship between father and daughter. Edwards never employed any language revealing animosity nor bitterness toward his daughter. He never once showed flightiness nor any other mental condition commonly associated with delusions. He was always considerate, coherent and

logical. Very likely he was lonesome and disappointed. He had found it necessary at times to employ a man with whom to play tennis and a woman to serve him as companion, whereas his daughter, upon whom he had conferred a splendid education, including musical training, remained at the opposite extremity of the country. It is clear that he had hoped for a different situation. He had expressed a hope for grandchildren. He had also spoken to Virginia about residing in some place nearby, and had presented her with an automobile in 1927, apparently in the expectation that she would do so, and thus could come to him from time to time. He had written several letters to Virginia suggesting that she marry a man of proven worth and pointing out how to choose a man of that kind. Instead of marrying a man who had succeeded in establishing himself she married a student. The manner in which the marriage was consummated must have impressed Edwards that his wishes were not consulted and that the decision was a hasty one. Since marriage Virginia's letters to the father became fewer in number. Surely many parents would have displayed disappointment at such a development. No reaction indicated by Edwards' conduct can be classified as a delusion unless it was not founded upon a substantial fact. Since we are not aware of any mental process which Edwards underwent concerning the marriage which was not founded upon some fact, we conclude that he was not subject to delusions.

Let us now turn to the problem whether the will was the result of undue influence exerted by Mrs. Longo and Adolph Sieberts. The contestant's contention is that both of these individuals took advantage of Edwards and thus became beneficiaries of the will, to the exclusion of Virginia. Mrs. Longo was provided

for in wills executed by Edwards in 1924, February, 1926, September, 1926, and September, 1927. All of these bequests in her favor were in substantial amounts. Sieberts was given bequests in the wills of October, 1921, January, 1922, December, 1922, November, 1924, and September 16, 1927. He was also nominated in two of the wills as one of two executors of the estate. No contention has been advanced that Mrs. Longo or Mr. Sieberts won these provisions by any improper conduct. Mrs. Longo's daughter, Ann Elizabeth Whiting, a child of tender years, had also been mentioned by Edwards in previous wills. Employees of Edwards' store were frequently mentioned in earlier wills of Edwards. One of his favorite ideas was to bequeath the stock to the employees upon condition that they pay prescribed sums of money over a period of years into a trust fund. In this manner he had hoped not only to establish a trust fund for his beneficiaries but also to benefit the employees by enabling them to purchase the store at less than its real value. Indicating the lack of any adequate opportunity for the exercise of improper influence by Mrs. Longo upon her brother is the circumstance that she had not been in the same city with him for approximately six months. Her home was in Seattle and Edwards resided in San Diego. Upon the other hand, Virginia had visited with her father in San Diego two months before he executed this will. Mrs. Longo, for a score of years, had displayed a wholesome, affectionate interest in Virginia. It is now the contention of the contestant and her mother that this interest was a sham resorted to for the purpose of impressing Mr. Edwards, who, as we have seen, was very fond of his daughter. It is difficult for us to believe that any individual would resort to such treachery. Especially do we find it

difficult to subscribe to this contention when we take note of the circumstances which we shall now mention. Mrs. Longo had suggested to Mr. Edwards that he should not send Virginia east to secure an education for fear that she might marry in the east and he would thereby lose her. Having heard of the impending marriage, she invited Virginia to be married in her home, an invitation which she would have been most unlikely to extend if she had sought to cultivate her brother's good will. When Edwards refused to send Virginia a wedding present because she had not yet established a home, Mrs. Longo finally succeeded in persuading him to do so. When Mrs. Longo gained the impression that Edwards contemplated matrimony with Mrs. Murray, she recommended that he do so if it would increase his happiness. Had Mrs. Longo merely sought to improve her chances of gaining her brother's fortune she certainly would have opposed his taking a new wife. In the latter part of 1928 Mrs. Longo urged Virginia to visit her father, under the belief that he was then ill and contemplated an operation. If Mrs. Longo desired to create ill will between father and daughter she certainly would not have given that urgent advice. Virginia admits that the visit which she made to her father was prompted by Mrs. Longo's urgent letter.

The contention that Mrs. Longo poisoned her brother's mind against Virginia is based largely upon the testimony of Mrs. Murray, who claims that she read letters which Mr. Edwards received from Mrs. Longo after Virginia had announced her intention to marry Mr. Earle. She testified that in these letters Mrs. Longo declared that Virginia should have waited a year before entering into this marriage, should have

spent a year with her father, and that she displayed a lack of proper affection for him. The record contains at least one item of testimony which strongly suggests that before these alleged letters were written Edwards had already expressed disappointment at Virginia's proposed marriage to the student, Earle. The relationship between Edwards and Mrs. Longo was none other than that which one would expect between a brother and sister. There were periods in which Edwards was sorely displeased with his sister, and at no time did he display any unusual confidence in her judgment. His gifts to her were exceptionally few and of minor consequence. He charged her for the items of furniture which she bought at his store, and added interest upon her overdue account. Upon one occasion she borrowed $500 from him and when it was repaid he exacted interest. There is no evidence which indicates that Mrs. Longo was aware that Edwards contemplated the preparation of a will in 1928 or 1929. After having carefully examined these portions of the evidence, we have not been brought to any conviction that Mrs. Longo was guilty of the charges laid against her.

We come now to the question whether Mr. Sieberts obtained his bequest through the exercise of undue influence. This problem is one which we find easy of solution. Edwards displayed an unusually friendly interest in his employees. He was constantly endeavoring to benefit their condition and to reward them for faithful service. At times he employed a bonus system which at one time caused him to distribute among his employees one-third of his net profits. He also had devised methods by which the employees could purchase stock of the Edwards Company and pay for it largely with the net profits earned by the stock. He

helped his employees with their dues in athletic clubs and to attend lectures on salesmanship. After he began in the year 1922 to spend much of his time in California, his expressions of appreciation for the loyalty of his employees increased in number. He rewarded Mr. Herndobler, vice president of the Edwards Company, and one of the beneficiaries under his will, with several substantial checks as rewards for his efforts to prosper the Edwards Company. To other employees he was also generous. In one of his letters to Sieberts he declared: "I will tell the world that if it wasn't for the people who are working in that business I would wind it up and become a resident of California within the year, but you may rest assured that I have no intention of so doing as long as you can make interest on the investment and pay yourselves enough to make it worth your while for the work." October 23, 1928, Edwards wrote to Sieberts the following letter:

"Dear Ade:

When I come up next week, I want to talk over with you boys the subject of my estate, and so forth—so I am saying something about it in advance, that you may have time to think, and if possible, be of some help on this most complicated subject.

It is said that reading makes a full man, speaking makes a ready man, and writing makes an exact man. 'Write it down' is one of the rules of correct thinking. So, on a subject which causes many men to shy off and leave their estates in a mess, I prefer to study with you how best to put my affairs in good order, and not cause the entire economic waste usual in a change of ownership.

I have pretty well settled in my mind who are to be the beneficiaries. Just what share each shall have, I may change from time to time. The subject of how the

estate shall be administered, so.as to get the most re-turn from the capital, and thereby doing the most good to the beneficiaries, is most complicated. For instance: 'Is it advisable to try to run the business after my death? If so, under what restrictions? And then we come to the problem if and when you pass out of the picture. Your end is just as sure as mine; it is a contingency to be provided for. If we are to liquidate on my decease, how shall the trustee be instructed on the subject of investments? Will it be more profitable, safer, or better business to liquidate in one or two years?'

The question I am going to put to you and Hern-dobler, and maybe to some others is:

'What would you do if you were in my place? How would you leave things, and why?'

Unless first-class plans are laid, the lawyers, tax collectors and others will reap a rich reward. If we can plan ahead, it may take us some time, but there is a great satisfaction in fooling the tax people if we can do it under the law.

It is a great satisfaction that I am able now to establish the trust for Virginia at what I estimate to be a saving of ten to twenty thousand dollars in taxes, fees, and so forth.

These things must be worked out, so that they do not come under the rule 'Done in anticipation of death.'

The United States revenue taxes you have been up against, but all of the different death grafts no one can know. However, I would like to try and beat some of them.

When a family works for two generations on an estate, is that estate not a worth-while subject for thought? What is going to happen to it?

Very sincerely,

T. H. E."

November 6, 1928, he sent to Mr. Sieberts another letter from which we copy the following parts:

"Dear Ade:

While I am alive, I do not particularly need the income·from the capital invested in the business; but when I am gone, the beneficiaries will need and expect what I devise to them,—that is income.

This income, as I have defined it, is to be a sum annually, not less than five per cent of the value of the personal property, less taxes, which shall come into the hands of the trustee.

The estate, at present writing, would inventory something like this:

| | |
|---|---|
| Negotiable securities | $125,000 |
| Real estate | 35,000 |
| Stock of Edwards Company | 300,000 |
| A total of | 460,000 |

The taxes, I estimate, including expenses of other settlements  *   *   *

I just looked up the Oregon tax schedule on an estate of $500,000, left to a child or near relative— the tax is $17,525.. The tax on the same estate, if left to a non-relative is $138,125; so you see that the laws of the state of Oregon do not favor a man who wants to do anything for his employees.  *   *   *  The reason I am writing in this rambling way is that it helps me to think, and the more I think, the more mixed up I get. But someone must do a lot of thinking on this subject, and that is me.  *   *   *"

The above, as well as other letters which followed, indicated clearly that Edwards was endeavoring to determine how his furniture store could be continued after his death with competent management and without the uncertainty usually attendant upon the probating of estates. It developed that he also was determined to draw $200,000 out of the working capital of the Edwards Company. These are the problems upon which he sought help. Sieberts, in letters, ex-

pressed willingness to help but received a reply that the problem was too difficult for his solution and that he should give over his full thought to the Edwards Company. Later, Sieberts, with the assistance of Mr. B. B. Coles, one of the officials of the Security Savings & Trust Company, prepared a series of suggestions for continuing the Edwards Company. One of these suggestions contemplated the purchase of the store by Sieberts upon a deferred payment plan. Sieberts did not like the idea of reducing the capital investment of the company. The reply which he received indicates forcefully how little influence Sieberts possessed with Edwards. We quote a portion of it:

"My idea is to have you continue the business on a smaller scale, and I do not see what B. B. Coles knows about reducing a business. * * * Make up your mind that I am going to draw out as much as I can up to $200,000 under a plan that you may make or I will make myself. * * * I cannot see any merit in any plan to sell you or anybody else unless they can show me where the money is coming from to release some of the capital. * * * As you cannot pay even the interest or any part of it for the last two years, as things are, how could you expect to purchase the business. If you have anything on your chest ask me about it and I will put you straight."

The letters which passed between the two men indicate very clearly that Edwards knew his mind and that Sieberts, and not Edwards, was the party that was influenced. We find no evidence whatever in the record indicating that Sieberts in any manner influenced the will.

Finally, it is argued that the will is an unnatural one. Had this will been written in 1926 this argument would possess more merit. In that year the trust fund had not yet been established. This fund assured Vir-

ginia of an income of at least $100 a month and granted her testamentary disposition of over $90,000 of high grade stocks and bonds. Had the $90,000 bequest been inserted in the will scarcely anyone would suggest that Virginia had been disinherited. Yet the trust fund was in operation prior to Edwards' death and freed the bequest of probate expenses and delays. Moreover, in 1926 the relationship between Virginia and her father underwent a severe strain. She championed the cause of her mother in the pending trust fund controversy, and thereby at times greatly irritated her father who never loved opposition. Virginia was so fearful of the consequences that might follow these unhappy occurrences that she altered her course of study at Wellesley College so as to equip herself to earn a livelihood. Her marriage, likewise, as we have seen, was a severe disappointment to him. Just before Edwards prepared the 1929 will the trust fund became operative and this contained a substantial provision for Virginia. Edwards on several occasions expressed satisfaction with his act in providing for Virginia. To Mrs. Colwell, the stenographer to whom he dictated his will, he explained, ''I made a settlement on my wife and daughter at the time of the separation.'' He seemed to believe that in that manner he had avoided probate and tax expense items.

Edwards' interests in life had been exceptionally few. His home life and his marriage had given him scant pleasure. Very likely the fault was his. He moved about in a small circle. His intimate friends were few in number. His wealth and the problems associated with it concerned him much. Into this somewhat drab existence came Virginia. She was the only bright influence which had ever brought him real

joy and happiness. Then came the unfortunate disappointment of 1928. To a life which was lonely came that great shock.

In the light of the circumstances reviewed above, it seems to us that the will was not unnatural.

Seven months after the will was executed Edwards died. In those seven months he frequently mentioned his will, discussed the operation of trusts, and had a copy of the will in his San Diego apartment. These circumstances add strength to our conviction that the document he left expressed his real will.

The principles of law applicable to this situation are so simple that we have refrained from discussing them. We are convinced that Edwards possessed testamentary capacity, and that the will was the product of his choice, uninfluenced by fraud or other improper conduct.

It follows that the orders and decree of the circuit court are affirmed.

BELT and KELLY, JJ., concur.

CAMPBELL, J., not sitting.

---

FAVORING REVERSAL OF DECREE.

RAND, J. This proceeding was instituted by Martha Virginia Earle, the only child and sole heir at law of Thomas Henry Edwards, deceased, to set aside the will of her father upon the ground of want of testamentary capacity, fraud and undue influence. He died at San Diego, California, on September 16, 1929, at the age of 59 years, leaving an estate estimated to be of the value of more than $400,000. The will was executed on February 21, 1929, and gave to the

daughter the sum of $100 only, and the remainder of his property was given to other persons who had but little, if any, claim upon his bounty. The will was probated in common form on September 20, 1929, and in these proceedings, which are equitable in their nature, the proponents of the will are seeking to have it reprobated in solemn form. The matter was heard before the Honorable George Tazwell, judge of the probate department of the circuit court for Multnomah county, and the trial resulted in a decree sustaining the will, from which the daughter has appealed.

Under the terms of this will, testator gave $100 to his daughter, $100 to Mrs. Laura V. Edwards, his ex-wife, and to Mrs. Frances E. Murray, his housekeeper, he gave his automobile and personal effects. The remainder of his property, which a short time before he had estimated to be of the value of $460,000, he gave in trust to the Security Savings and Trust Company, a corporation of Portland, Oregon, and, during the life of the trust, he directed the trustee to pay from the net income of all said trust property 1/20 thereof to the Sisters of Mercy; 1/20 to the Sisters of the Holy Name; 2/20 thereof to Albert H. Herndobler during the term of his life and, if his wife survives him, to her during the term of her life, and, upon the death of both Herndobler and wife, to their surviving children born before January 1, 1928, during the term of their life or lives; 5/20 thereof to Adolph G. Sieberts during the term of his life and, if his wife survives him, to her during the term of her life and, upon the death of both Sieberts and his wife, to their surviving children born before January 1, 1928, during the term of their life or lives; 5/20 thereof to his sister, Mary E. Longo, during the term of her life and, upon her death, to

Ann Elizabeth Whiting, her daughter, if she survives her mother, during the term of her life and, upon her death and the death of her mother, to the heirs of the body of Ann Elizabeth Whiting, if she leaves any such surviving her, then to them during the life of the trust; 1/20 to Lauretta C. Schultz during the term of her life; 1/20 to Elaine Hamblin so long as she remains single; 1/20 to Frances E. Murray so long as she remains single; 1/20 to Sanford E. Whiting, Jr., a stepson of testator's sister, during the term of his life; 1/20 to Winnie Landis so long as she remains single; 1/40 to William Tilke during the term of his life, and 1/40 to James Day during the term of his life.

The will provides that the trust to be created thereunder shall continue until the death of the last survivor of certain named beneficiaries, namely: Frances E. Murray, Mary E. Longo, Ann Elizabeth Whiting, Lauretta C. Schulz, Elaine Hamblin, Albert H. Herndobler, his wife and the heirs of her body born prior to January 1, 1928, Adolph G. Sieberts, his wife and the heirs of her body born prior to January 1, 1928, and that, upon the death or disqualification of any of the beneficiaries who were to take under the trust, the bequest to them shall cease and thereafter their share shall be paid proportionately to the beneficiaries who may then be living and not disqualified. The will also contains a provision that ''In case Ann Elizabeth Whiting should not survive Mary Edwards Longo and should not leave heirs of her body, the said 5/20 of my net income shall revert to my trust estate.'' The residuary clause provides that upon the termination of the trust, the trust property shall be distributed 1/20 to the Sisters of Mercy, 1/20 to the Sisters of the Holy

Name, and the remaining 18/20 to the heirs and devisees of Ann Elizabeth Whiting. The will names Herndobler and Sieberts as executors and, pursuant thereto, they have been appointed as such and have accepted the trust.

In a proceeding of this nature the first question for decision is: Upon whom does the burden of proof rest? Formerly, it was the rule in this state that where a will probated in common form was attacked by a direct proceeding seeking to revoke the former probate thereof and to have the will declared invalid, it was incumbent upon the proponents of the will to prove not only the sanity of the testator but every other disputed fact necessary to sustain its validity. See Holman's Will, 42 Or. 345 (70 P. 908), and authorities there cited. That rule, however, was modified in part in *Re Sturtevant's Estate,* 92 Or. 269, (178 P. 192, 180 P. 595), where it was held that the burden of proof is upon the proponents to establish that the testator was of sound and disposing mind at the time he made the will and that the will was executed in due form, and that when these facts had been established, then the burden of proving the fact of fraud or undue influence is upon the contestant. As so modified, that rule has been adopted and approved in all the later decisions of this court and the fact of fraud or undue influence has since been treated as a counterplea of contestant and, therefore, to be proved as a part of his case: *Rice v. Rice,* 95 Or. 559 (188 P. 181); *Re Estate of Moore,* 114 Or. 444 (236 P. 265); *In the Matter of the Will of Robert Carr,* 121 Or. 574 (256 P. 390); *In re Wayne's Estate,* 134 Or. 464 (291 P. 356, 294 P. 590, 79 A. L. R. 1427); *Copenhefer v. Powers,* 137 Or. 145 (300 P. 505).

It will be seen, however, from an examination of this will that Edwards not only disinherited his only child but also his own grandchildren, if such should be born of his daughter. Such a will is an unnatural will and one which has been termed an inofficious will; that is to say, one in which natural affection and the claims of near relationship have been disregarded. Under this will, the testator gave substantially all his estate to his sister, her daughter, his sister's stepson, who was of no relationship to him, and to persons in his employ. His sister and his employees, who are the principal beneficiaries under the will, all occupied a relationship of special trust and confidence to him. Where such relationship exists between the testator and the beneficiaries and the will, as made, is not consistent with the claims of duty and affection, the rule in this state is that slight evidence that the legatees or devisees have abused the confidence reposed in them would be sufficient to avoid the will. *Greenwood v. Cline,* 7 Or. 17; *In Re Diggin's Estate,* 76 Or. 341 (149 P. 73); *Re Dale's Estate,* 92 Or. 57 (179 P. 274); *Re DeHaas' Will,* 135 Or. 399 (296 P. 42).

Moreover, the evidence shows that Edwards had a hobby for making wills. Mr. Shively, his attorney, testified that as soon as Edwards had executed one will he commenced to prepare another, and the evidence shows that between August 3, 1920, and February 21, 1929, when this last will was made, he had executed not less than nine wills and that in every one of said wills except the one in question here, he had given a very substantial portion of his estate to his daughter. Hence, we have not only an unnatural will but a sudden change in the attitude of the testa-

tor toward his daughter and an entire departure from a large number of wills previously made. As shown by the testimony to which we will later refer, the testator had been suffering for years from diseases which not only affected him physically but also mentally. Under such circumstances, the making of this unnatural will in favor of persons occupying positions of trust and confidence to himself and his sudden and radical departure from the policy which he had always theretofore followed of providing liberally for his daughter in his wills is some evidence of mental unsoundness, fraud and undue influence. As was said in *Re Faling's Will*, 105 Or. 365 (208 P. 715) : "A marked change in a person's habits and thoughts is evidence of mental unsoundness. Insanity is indicated by proofs of acts, declarations and conduct inconsistent with the character and previous habits of the person: Knapp v. St. Louis Trust Co., 199 Mo. 640 (98 S. W. 70, 78.)."

In this state the law permits the largest exercise of volition in the disposal of property after death, but it requires as a condition that this volition should be exercised by a mind of natural capacity not unduly impaired by old age, enfeebled by illness or tainted by morbid influence or mental perversion. Such a mind, in the language of the law, is "a sound and disposing mind." The right to make a testamentary disposition of property, which the law concedes, is founded upon the assumption that a better disposition will be made by a rational will than can be made by the law itself. The law does not require that the testator shall have a perfectly balanced mind; that is to say, a mind which is free from all influence of prejudices, passion or pride, nor is a man incapacitated for making a will if,

in disposing of his property, he is moved by capricious, frivolous, mean or even bad motives. Under the law, every person of sound mind is left free to choose the person upon whom he will bestow his property after death, entirely unfettered in any selection he may think proper to make. "He may," as has been said, "disinherit, either wholly or partially, his children, and leave his property to strangers to gratify his spite, or to charities to gratify his pride, and we must give effect to his will, however much we may condemn the course he has pursued." *Boughton v. Knight*, 3 L. Rep. (Courts of Probate and Divorce), 64. But the power to so dispose of property is upon the condition that the testator has a sound and disposing mind, and, unless such condition exists, the will is invalid. The testator must have a memory to recollect the several persons who may be fitting objects of his bounty and an understanding to comprehend and appreciate their relationship to him and the claims to which he ought to give effect. He must also understand the nature and effect of the act in which he is then engaged and understand or have the capacity to understand the property he is about to dispose of. Our latest decision upon this question is *Copenhefer v. Powers*, 137 Or. 145 (300 P. 505), where, after citing numerous cases, this court said:

"If the testator at the time of making his will comprehends the nature of the act in which he is then engaged, knows the nature and extent of the property which makes up his estate and which he intends to dispose of, and has in mind the persons who are, should or might be the objects of his bounty, and the scope and reach of the provisions of the written instrument, he has sufficient capacity to make a will."

However, as was truly said by Lord Chief Justice Cockburn in *Banks v. Goodfellow,* Law Rep. 5 Q. B. 549:

"It is essential to the exercise of such a power (the making of a will) that a testator shall understand the nature of the act, and its effects; shall understand the extent of the property of which he is disposing; shall be able to comprehend and appreciate the claims to which he ought to give effect, and with a view to the latter object that no disorder of the mind shall poison the affections, pervert his sense of right, or prevent the exercise of his natural faculties, that no insane delusion shall influence his will in disposing of his property, and bring about a disposal of it, which, if the mind had been sound, would not have been made. Here, then, we have the measure of the degree of mental power which should be insisted on. If the human instincts and affections, or the moral sense, become perverted by mental disease, if insane suspicion or aversion take the place of natural affection, if reason and judgment are lost, and the mind becomes a prey to insane delusions calculated to interfere with and disturb its functions, and to lead to a testamentary disposition, due only to their baneful influence, in such a case it is obvious that the condition of testamentary power fails, and that a will made under such circumstances ought not to stand."

Before discussing the testimony, we think another principle of law applicable under the facts of this case should be stated. It is contended by the contestant that at the time this will was executed Edwards was under a morbid or insane delusion that his daughter no longer loved him; that she had voluntarily left him and was lost to him forever. That he had such a delusion and was influenced by it and made a different testamentary disposition of his property because of it, and that he was sane in most, if not all, other respects we think is clearly established by the testimony.

It seems to be a well-settled principle of law that an insane delusion will not incapacitate a person from making a valid will unless the delusion directly affects the testamentary act itself. But that if it does, then the will is invalid no matter how sound the mind of the testator may have been in all other respects. In *Banks v. Goodfellow,* supra, the court stated the question for decision to be:

"* * * whether partial unsoundness, not affecting the general faculties, and not operating on the mind of a testator in regard to the particular testamentary disposition, will be sufficient to deprive a person of the power of disposing of his property."

In disposing of that question, the court said:

"* * * The pathology of mental disease and the experience of insanity in its various forms teach us that while, on the one hand, all the faculties, moral and intellectual, may be involved in one common ruin, as in the case of the raving maniac, in other instances one or more only of these faculties or functions may be disordered, while the rest are left unimpaired and undisturbed; * * * there often are, on the other hand, delusions which, though the offspring of mental disease and so far constituting insanity, yet leave the individual in all other respects rational, and capable of transacting the ordinary affairs and fulfilling the duties and obligations incidental to the various relations of life. No doubt when delusions exist which have no foundation in reality, and spring only from a diseased and morbid condition of the mind, to that extent the mind must necessarily be taken to be unsound; just as the body, if any of its parts or functions is affected by local disease, may be said to be unsound, though all its other members may be healthy, and their powers or functions unimpaired. But the question still remains, whether such partial unsoundness of the mind, if it leaves the affections, the moral sense, and the general power of the understanding unaffected,

and is wholly unconnected with the testamentary disposition, should have the effect of taking away the testamentary capacity.''

And it was held that delusions which arose from mental disease, but were not calculated to prevent the exercise of the faculties essential to the making of a will, or to interfere with the consideration of the matters to be weighed and taken into account on such an occasion, and which delusions had no influence on the testamentary disposition in question, were not sufficient to deprive one of testamentary capacity.

In *Fraser v. Jennison*, 42 Mich. 206 (3 N. W. 882), in a decision written by Judge Cooley, the court said:

''It is not an uncommon impression that a will must be set aside whenever the existence of any mental disorder at the time of its execution is established. Waring v. Waring, 6 Moore's P. C. Cas., 349. That this is not the law is apparent from the fact that the testamentary dispositions of monomaniacs are often sustained in spite of the mental disorder. When the monomania is conceded, it is only necessary to inquire further whether the provisions of the will are or are not affected by it, and the will stands or falls by that test. Dew v. Clark, 1 Add. Ec., 279; 3 Add. Ec., 79; Dunham's Appeal, 27 Conn., 192; Lucas v. Parsons, 24 Ga., 640; Boardman v. Woodman, 47 N. H. 120; Crum v. Thornley, 47 Ill., 192; Thompson v. Kyner, 65 Penn. St., 368; Benoist v. Murrin, 58 Mo., 307; Banks v. Goodfellow, L. R. 5 Q. B. 549; Pidcock v. Potter, 68 Penn. St., 342. A man may believe himself to be the Supreme Ruler of the Universe, and nevertheless make a perfectly sensible disposition of his property, and the courts will sustain it when it appears that his mania did not dictate its provisions.''

The rule in this state is that, in order to show that testamentary disposition has been affected by insane delusions, it must appear that the testator's delusions

in some manner entered into the making of his will. The holding of delusions does not of itself constitute testamentary incapacity but affects testamentary capacity only when it enters into or controls in some degree its exercise: *In re Sturtevant's Will*, supra; *In re Heaton's Will*, 224 N. Y. 22 (120 N. E. 83).

It is clear from the reading of this will that Edwards, when disinheriting his daughter, was acting under the belief that his daughter no longer loved him, and that she occupied no better position in his mind than that of a mere stranger. This belief, if well founded or if based upon any evidence whatever, might perhaps be held to explain his motive for disinheriting her but it could hardly be held to be a sufficient ground for disinheriting her children. To disinherit his own grandchildren because of the supposed fault of their mother, whether such supposition was well founded or not, is in itself alone some evidence of a diseased mind, for it is hardly conceivable that any rational mind would disinherit his own grandchildren, who, when born, would be his sole descendants, because of some supposed fault of their mother. That he had the legal right to do so, however, if no disorder of the mind had poisoned his affections and perverted his sense of right, or prevented the exercise of his natural faculties, or if no insane suspicions or aversions had taken the place of natural affection and if his reason and judgment were sound, is clear.

This leads to the consideration of what constitutes an insane delusion. The term "delusion" as a test of insanity has variously been defined, but no satisfactory definition applicable in all cases and under all circumstances has been found. In common parlance, a man may be said to be under a delusion when he only

labors under a mistake, but this affords no legal test. In *Potter v. Jones,* 20 Or. 239 (25 P. 769, 12 L. R. A. 161), Mr. Justice Lord, with his usual clearness and accuracy, attempted to define what constitutes an insane delusion, one of which definitions he quotes with approval from *Dew v. Clark,* 3 Add. Eccl. 79, as follows:

"Wherever the patient once conceives something extravagant to exist, which still has no existence whatever but in his own heated imagination, and wherever at the same time, having so conceived, he is incapable of being, or at least of being permanently reasoned out of the conception, such a patient is said to be under a delusion, in a peculiar, half technical sense of the term, and in the absence or presence of delusion, so understood, forms, in my judgment, the true and only test or criterion of present or absent insanity."

Another definition given in that case is as follows: "Delusions are conceptions that originate spontaneously in the mind without evidence of any kind to support them, and can be accounted for on no reasonable hypothesis." They have no foundation in reality and spring from a diseased or morbid condition of the mind. Another definition elsewhere given is "a pertinacious adhesion of the patient to some delusive idea in opposition to plain evidence of its falsity," and one which, when conceived, the patient is unable of being permanently reasoned out of.

It appears from the record in this case consisting of 3,300 pages of testimony in addition to 600 exhibits, that Edwards was born in Portland, Oregon, on September 14, 1870, his father being of Welsh and his mother of Irish ancestry. He attended a parochial school at Montreal and later took a course in civil engineering at the Rensselaer Polytechnic Institute at Troy, New York, graduating therefrom in 1891, but he never followed that profession. His father owned

and conducted a retail furniture store in Portland under the corporate name of Edwards and Company for whom testator worked until his father's death in 1913. During that time he also studied law but whether or not he was admitted to practice we do not know from the evidence. At any rate, he never practiced that profession. Under his father's will, the capital stock of said company and his other property passed in equal shares to testator and his sister, then Mrs. Mary E. Merges, later Mrs. Mary E. Whiting, and now Mrs. Mary E. Longo. Shortly thereafter testator purchased from his sister her part of the capital stock and, until his death, he had control of the corporation. The business of the store was profitable and testator invested the profits thereof in stocks and bonds, some of which he held at the time of his death. While a student at Troy, New York, testator met and became engaged to marry Laura V. Curtis. They were married in 1895 and contestant, their only child, was born on July 6, 1905. About 1900 Mrs. Edwards inherited $10,000 from her father's estate, which she gave to testator and with it he purchased in his own name their home and a garage property in Portland. So far as the evidence shows their marital relations were always pleasant until 1926, when he insisted upon his wife getting a divorce from him, which she did contrary to her own wishes. During that year the Portland home was sold and, from the proceeds of the sale, she received $5,000. After that they lived separate and apart, she in Los Angeles and he in San Diego, California.

As a property settlement between himself and his wife, he first agreed to place in trust securities of the value of $100,000 and to provide in the trust agreement that she should receive from the net income

thereof, or from the corpus of the trust if necessary, $500 per month for her maintenance and support during the term of her life. This agreement was later modified by mutual consent, whereby it was agreed that securities of the value of $90,000 only should be placed in trust and that Mrs. Edwards was to receive $300 and the daughter should receive $100 per month during the term of their natural lives, and that upon the death of the survivor, the property placed in trust should pass to the heirs or legatees of the daughter. One of the grounds which he urged to induce Mrs. Edwards to accept such property settlement was that he wanted to be free to leave the remainder of his property upon his death to his daughter.

Pursuant to their agreement, Mrs. Edwards obtained an interlocutory decree of divorce on August 31, 1927, and by the terms thereof he was required to pay $500 per month for her maintenance and support. He made said payments until October 31, 1928, when the property settlement contract was performed by his depositing in trust with the Security Savings and Trust Company, one of the proponents herein, securities of the value of $90,000, since which time Mrs. Edwards has received from the trustee $300 and the daughter $100 per month. That trust and the one created by this will are wholly different trusts and have no relation whatever to each other. We have referred particularly to this separation, divorce and property settlement agreement because of proponents' contention that, in thus providing for the payment to the daughter of $100 per month, Edwards had already provided for his daughter before executing this will. This and other contentions growing out of the same matter will be later considered.

It appears from the evidence that for several years prior to his death, Edwards had been suffering from a diseased and enlarged prostate and other diseases which either resulted therefrom or developed concurrently therewith. In 1922, contestant attended Dana Hall, a preparatory school for Wellesley, and entered Wellesley the following year, graduating therefrom in 1927. She spent the vacation period each summer with her parents up to the time of their separation and later she divided the time between them. Upon her return to the west in 1923, she says her father's health that summer was very poor; that he had taken an examination for life insurance and he informed her that the life insurance people said his life was not worth much at that time. He had promised to accompany her east that year when she returned to college but she says he was not well enough to do so. At or about that time, Dr. Sanford Whiting, his then brother-in-law, told him he had but a short time to live. Doctor Whiting died first and testator often boasted that he had outlived him. Each summer thereafter, upon contestant's return home, she observed that her father's physical condition was gradually becoming worse. During the vacation of 1924, she says her father was not the same man that he had been. In 1925, when she came home from college, she says: "It was more apparent that father was not well and that his whole makeup was changing. He was not the same father that I had known in 1922, although he never showed any change in his affection for me." She says he was more irritable and more impatient. In 1926, he was not only ill but in a very nervous state and was almost frantic to be free of his marital relations, and that, because of his physical and mental condition, the

contestant advised her mother to accede to his wishes and obtain a divorce, so that he could have his freedom.

Mrs. Edwards testified that Edwards had been afflicted with prostate trouble for a long time and that in 1926 when the separation took place he was very much worse than formerly. He was cross, irritable, and critical of her and others, while before that time he had always been kind and considerate of her. She says that when he saw persons eating eggs, he said they were crazy. Mrs. Edwards also testified that in 1926, Mrs. Longo told her that her brother's illness was affecting his mind. According to all the testimony, Edwards' physical condition gradually grew worse from 1926 on. He made a hobby of dieting and, while advising others on that subject, he never consistently followed the rules himself. He was much prejudiced against physicians, always distrusted them, saying that they were merely trying to get his money. He had been advised to have an operation for his prostate trouble and had always refused to do so. Upon separating from his wife, he went to San Diego and engaged the services of Mrs. Frances E. Murray as housekeeper, cook and nurse and about the time his wife secured the interlocutory decree of divorce, he became engaged to marry Mrs. Murray. That marriage, however, was never consummated because of his illness, although the relation of housekeeper, cook and nurse continued up to the time of his death, and in his several wills made thereafter she was always named as one of the beneficiaries.

Mrs. Murray testified that she met Edwards in February, 1926, and played tennis with him and some times went in swimming with him. At that time he

complained of a knot and soreness in his bladder and said that when he ate certain kinds of food or indulged in coffee and cigars, it made this soreness more severe. He was, however, an inveterate smoker. In 1927, she says, he was some better. In the summer of 1928, he visited his sister at Seaside and returned quite ill on August 3. On the following day, she says, he had what he called the influenza, from which she says he never recuperated. He just grew worse. He had no pep and could not play tennis and in November of that year he "got very, very bad." He had asthma, his legs were so swollen they almost filled his trousers; he could not sleep, coughed up much blood, and would have nosebleeds considerably. In the following spring he gave up playing cards at the Elks' club, saying he could not concentrate. She says she took him riding afternoons and that he would sleep sitting up in the car like a drunken man, some times during the whole afternoon. She says she noticed that Mr. Edwards' mental condition became affected in the latter part of 1928. He was irritable, hard to get along with, critical of others, his conversations became disconnected and illogical; he would forget the trend of his conversation and find it necessary to start all over again.

It appears from the testimony of Mr. T. F. Patton, who is a registered nurse and claims to give the same treatment as is given in the Battle Creek Sanatarium at Battle Creek, Michigan, that he began treating Mr. Edwards in August, 1928, and continued such treatments until Mr. Edwards' death. He stated that Mr. Edwards was suffering from a bad case of uremic poisoning from which he says Edwards had been suffering for several years prior to the time he first treated him. He says that he discovered soon after he

began the treatment that Edwards had residual urine—that his bladder was continually filled with urine residue which he could not void. He also discovered he had a large prostate gland and advised Edwards that if he would let him relieve the bladder of the urine, it would help him and, to a great extent, lessen the uremic poisoning. He says that Edwards was absent from San Diego and that upon his return, "he was really. in bad shape when he came back to me." He says Edwards' legs were swelled up to the knee. He had lost weight through the chest and the poisoning from the retention "was getting in its work." He had the "flu" and was in pretty bad shape. He then advised him to engage the services of Doctor Butterfield.

Doctor Butterfield testified that he examined Edwards on three occasions: November 22, 1928, April 17, 1929, and August 6, 1929. He says that he found Edwards to be suffering from uremic poisoning and that such condition makes a man less acute mentally and, as it progresses, the patient goes into a coma; he is unable to form good judgment and inclined to base his judgment upon reasons which to a normal person would be inadequate and insubstantial.

Edwards also called Doctor Cunningham of San Diego, an osteopathic physician. He testified that Edwards had an enlarged prostate gland and kidney and liver trouble. He says that Edwards "impressed me as being suspicious of everybody, thought they were trying to do him." He also testified that Edwards was the type of man that, if you made a suggestion to him about somebody else, as to a matter of no importance, he would immediately attach importance to it and become suspicious of that person.

He says that Edwards was of a positive type. If he made up his mind that he was going to do a thing, he would do it.

A few days after the execution of this will, Edwards wrote to a friend in Los Angeles, asking him to recommend a diagnostician to give him a physical examination, and this friend recommended Dr. Frederick Speik. Edwards consulted Doctor Speik on March 14, 1929, which was only three weeks after the execution of the will. Doctor Speik says:

"This man came in here, and he was a very sick man, so I sent him to the hospital at Pasadena. His blood count was low and he had high blood pressure; he had an enlarged heart, and he was a little erratic in his mind, because, when I sent him to the hospital, he left early the next morning without consenting to stay there like any normal man would do, for treatment, and it was my idea that he was not in his right mind to do that sort of thing, and also that he had been sick for a long time before he came to me. * * * He might have had that coming on for years. He had a gradual hardening of the arteries, and an enlargement of the heart; he had an enlargement of the prostate gland, which we thought might be cancer; he had this swelling in his feet and ankles, and an abdominal swelling, and those things are just a sequel to things that follow in the *weight* of chronic nephritis; chronic nephritis is a disease of the kidneys. You don't get high blood pressure, unless you have trouble with your kidneys, and he had trouble with the kidneys; that was very evident. Then, in addition to that, he had an enlarged prostate, and that caused a backing up of the urine in his kidneys, which also affected his kidneys."

When asked if he catheterised Edwards, he said:

"No, I know we didn't, because we don't do it down here. They might have done it at the hospital, but it is not a good thing to catheterise these old men

when they have prostates like that. If you do, the kidneys lie down on you, and they won't function properly. Our method now is to stick a catheter in and drain it off gradually, before they operate on a patient for the removal of the prostate gland, or do a prostatectomy, as we say. Now, they drain a little urine off during the day time; if they took it all off at once, the kidneys would go on a strike and lie down on you, and the patient would die.''

When asked what the effect of a physical condition such as that would have upon a person's mental condition, he said:

''Well, it was simply a backing up of the poisons, which are not eliminated, and it is bound to affect the mentality of the individual. * * * I don't think they are as responsible as they would be otherwise. Q. What is their ability to exercise sound judgment? A. I don't think it is good. Q. Would you say whether or not a person in that condition would be more apt to reach conclusions for reasons which to ordinary persons would seem unsubstantial or unsound? A. I should think so. * * * He might be stubborn by force of habit all during his life, and this other thing coming on and encroaching on his mental condition might make him more stubborn in that way. On the other hand, it would affect his mind; there is no question about that, because he was a sick man; this man was more than sick physically * * * he was sick both mentally and physically * * *. He was sick; you could tell that by looking at him. You look at a man like that, and you know he is sick, whether you see him on the street or in the office, because he was pale, and his blood vessels were tortuous in his forehead, showing evidence of a degeneration of blood vessels, a hardening of the arteries and improper circulation.''

From his examination and the tests made, Doctor Speik testified that Edwards had a greatly enlarged heart, general arteriosclerosis, secondary anemia,

nephritis and general anasarca. He then says Edwards had "urinary retention, shortness of breath from exertion; his pulse rate was ninety; his blood pressure was 180 over 85; * * * he had a swelling up of his feet and ankles, fluid in his abdomen, enlargement of the heart, and enlargement of the prostate, and he was quite a pale, anemic looking individual. * * * we did not take out the prostate and could not examine it, so we could not tell definitely about whether he had cancer." He then said: "My conclusions are from the fact that he had fluid in his tissues and fluid in his lungs, and he must have had some fluid in the brain, and he must have had some fluid in the heart; that is the reason that these people die of a wet brain, frequently." He then said, "I have taught those things at the local college, at the University of Southern California, when they had a medical school; I was professor of the Department of Medicine at that time."

Mrs. Murray testified that Edwards gave her as his reason for leaving the hospital to which he had been sent by Doctor Speik that when he got to the hospital they put him to bed and the nurse brought him a pill, and he could not sleep for thinking about the pill. She says he said he got to thinking what if Doctor Speik was giving him dope to keep him there to get money out of him, and he couldn't sleep.

In a letter to Mr. Sieberts, dated May 1, 1929, referring to his trip to Portland at the time the will was made, Edwards said: "When I was last in Portland, the condition of my health was precarious * * * My troubles were blood poison with urea. * * *."

With the exception of Doctor Forbes of Seattle, none of the other medical witnesses, except those

named above, had known or seen testator during his lifetime. Edwards went to Forbes' office in company with his sister, Mrs. Longo, a day or two before the will was executed. Forbes said that they conversed together about one-half hour talking in a general way about the effect of prostatitis and Edwards' general health; that he made no examination of Edwards and advised him to come back for a general physical examination so that he could give him an opinion as to the advisability of operating upon him and the nature of the operation; that Edwards said he would do so if he remained in Seattle; that he never came back and Doctor Forbes understood Edwards left the next day for California. He said Edwards' mentality was that of a keen and alert mind and that he saw nothing which indicated any mental impairment.

A number of physicians residing in Portland and in that immediate vicinity were called as witnesses, two by contestant, the others by proponents, and they were interrogated upon the effect which the physical condition shown by Doctor Speik's examination of Edwards would have upon the mind of a person so afflicted and gave their answers in response to a hypothetical question based upon the physical condition Edwards was in as shown by Doctor Speik's testimony. Two of such witnesses, namely: Doctor Burkes, who was called by contestant, and Doctor Evans, who was called by proponents, are men of large experience and training in the treatment of insane patients; Doctor Evans has been for years connected with the Oregon State Hospital for the Insane and is recognized as a man of unusual ability along that line. The same may be said of Doctor Burkes, who, although not connected with that institution, has had charge of patients

in federal hospitals for the insane and is an alienist of recognized standing and ability in his profession. Both agree that uremic poisoning is a cause of mental impairment. Doctor Evans said that he believed that every person who dies of uremia develops mental symptoms prior to death; that cerebral edema in acute form would manifest itself in bringing about various mental symptoms and that cerebral edema is the end result of uremia; that a person suffering from uremia may or may not be subject to delusions; that among the manifestations of uremia are mania and delusional insanity and that these manifestations may come on abruptly in an individual who has shown no previous signs of mental trouble, and that cases of delusional insanity as a result of uremia are by no means uncommon. He said, however, that not having seen Edwards nor having had an opportunity to observe his actions and conduct, he could not, from the testimony of Doctor Speik, pass an opinion upon the question of Edwards' sanity.

Doctor Burkes said that the judgment of an individual in that condition would be impaired and the brain would not function in its normal manner. He says:

"I don't think the man was truly insane; that is, that he was mentally incompetent to the extent of that definition of insanity; but I do think the man was sick, his brain was tired; it was susceptible to emotional upsets and to influences. I don't think a man in Mr. Edwards' condition, making a will during the time that he was emotionally disturbed or upset because someone he thought had given him less consideration than he was entitled to—I don't think that his making the will during that period, that it would be the will that Mr. Edwards would make if he were entirely normal. * * * He was a sick man then;

his mind was sick; he was tired; he was anemic. Perhaps it might have been more or less in the condition that the tissues of his abdomen and legs were, showing swelling and increase of fluids. I think Mr. Edwards made his will, if we must talk on this particular party involved—during the time that he was pitying himself because his daughter had left him, she had not considered him; and in her decision to get married and move to the east, Mr. Edwards at that time was not particularly interested in what was going to be his daughter's future happiness, but he was thinking of himself; and during that period, while he was a sick man, he made this will that has been shown, and this was entirely different from all of his other wills that he made when he was a well man. * * * I think it stands to reason that any man of Mr. Edwards' caliber, having made previous wills, such as he did, having the affection for his daughter that is set forth there in that hypothetical question—then to suddenly change, without reason—I don't believe that man was just exactly right in his mental attitude at the time he made that will; and, getting back to my unqualified opinion, that he did make that will during some emotional distress, and during the time that he was a sick man, I don't believe that it is the will of Mr. Edwards when he was a well man. * * * that is my unqualified opinion; Mr. Edwards was a sick man when he made that will; it is not the will that Mr. Edwards would have made had he not been sick. * * * My opinion is based on the fact Mr. Edwards was a sick man when he made his will and that he showed a sudden change of attitude towards his daughter who had always been very close to him, and that change as indicated by the hypothetical question was the result of self-pity because his daughter had presumed so much as to marry and leave him. I think that would show that he was definitely mentally impaired at the time of the will * * *. In this particular case I want to say again that it is my opinion that Mr. Edwards, at the time he made that last will, was not mentally himself. * * * Considering in

this particular case the man's feelings, or his ego, or whatever you might want to call it, was offended because his daughter had presumed to get married. She was moving to the East and leaving him out here alone. He was pitying himself because he had lost his daughter. He was not considering the fact whether she was going to be happy or not, but he was unhappy. He was pitying himself. He was in a state of emotion, remorse, and in such a state of mind an individual is extremely susceptible to influences or suggestions.''

Dr. Dammasch, contestant's witness, says:

''I should say that the man was sick bodily, and probably sick mentally. I would base my conclusions as to the bodily sickness upon four outstanding pathological conditions admittedly present; firstly, generalized arteriosclerosis; secondly, a rather profound degree of secondary anemia; thirdly, upon the general anasarca, or what the layman knows as dropsy; and last, and probably of greatest importance, a chronic uremia.''

The conclusion to be drawn from the medical testimony is that a severe case of uremic poisoning is bound to affect the mind of the sufferer and might cause delusions.

A great number of lay witnesses, who knew Edwards in his lifetime, and many of whom saw him about the time the will was made, were called by proponents and almost without exception they testified that they observed nothing abnormal in Edwards' actions or conversations and that they believed him to be sane, and the whole evidence shows that up to a few days before his death, Edwards was competent to transact business and that, as a business man, he possessed more than ordinary ability.

The evidence further shows that Edwards was an inveterate card player, doing his playing at the Elks'

club in San Diego; that he always played for money and generally won, and that this continued until late in 1928, when he told Mrs. Murray he could not concentrate and did not care to lose his money, after which he played but little if any. The evidence further shows that he understood the mechanics of an automobile and talked intelligently with one of the witnesses about the repair of his car, but it appears from the testimony of both Doctor Evans and Doctor Burkes that many inmates of insane asylums are expert card players and some of them were exceptionally good mechanics.

The evidence shows that Edwards left San Diego on February 8, 1929, and came to Portland. While there he executed this will. His former wills had been prepared by either Mr. Shively or Mr. Latourette, both of whom are prominent attorneys of Portland. He did not consult them in reference to this will but went to the office of Mrs. Bessie F. Colwell, a public stenographer, taking with him a copy of one of his former wills and some handwritten notes which he left with her, telling her what provisions he wished inserted in the will. He then went to the home of his sister in Seattle, staying there a day or two. It was while on this trip to Seattle that he consulted Doctor Forbes. He then returned to Portland and executed the will that Mrs. Colwell had prepared for him and then returned to San Diego. At the time he signed the will, Harry Bert Bowe, an employee of the Royal Typewriter Company, came into the office. At the request of Mrs. Colwell, he went into the room where Edwards was and, at his request, signed the will as an attesting witness. Both say that Edwards was normal and sane at the time he executed the will. Mrs. Colwell had known him for several years but Bowe had never met

him before and was with him but a few minutes. As said by the court in *Culpepper v. Robie*, 155 Va. 64 (154 S. E. 687):

"The testimony of attesting witnesses to documents is entitled to 'great weight,' or as the courts sometimes express it, 'peculiar weight.' [Citing authorities.] This 'great weight' certainly should be given to the evidence of subscribing witnesses as to the execution of the instrument. Even to this act, however, such evidence is not conclusive. Page on Wills, § 664; Jenkins v. Trice, 152 Va. 411, at page 426, 147 S. E. 251."

As against this testimony, proponents introduced numerous witnesses who were not merely casual acquaintances and who knew Edwards more intimately. Mrs. Murray testified that she noticed Edwards' mental condition became affected in 1928; that he became irritable, hard to get along with, critical of others and his conversations became disconnected and illogical. He would forget the trend of his conversation and find it necessary to start all over again.

Mrs. Edwards testified that before he became ill, he was always neat in his appearance, kind and affectionate, and he was very modest, but after he became ill, he grew egotistical and self-centered. He talked about himself and his sickness and tried to force his opinions on others.

Mr. Stanley H. Daniels, a retired merchant of San Diego, who had known Edwards socially for about four years, testified that Edwards was a guest at his house on December 8, 1928, at a birthday party. He says Edwards' actions were radical. He was cross and snappy at different things, and he walked the floor. It was the same crowd that Edwards always associated with and played with, and with which he was on the

very best of terms, "yet he acted like he was—well, he didn't act like himself at all. * * * He wouldn't keep to any subject; he would start on a subject—he would start something and pretty soon he would stop, and pretty soon he would go on to something else clear off of it, and after he left, my wife said, 'What's the matter with that Edwards, anyway?'" He saw Edwards again on March 16, 1929, at a funeral, and he says Edwards "acted like a crazy man, and he looked about like a man that was ready to drop into a coffin; he looked sicker than the man that was laying in the coffin." He says that Edwards would come over to the tennis courts with Mrs. Murray sometimes "but he didn't play tennis, but he would sit there and I would talk to him, and he would talk rationally, and maybe the next time he came over there he didn't talk rationally at all, and he would make remarks against Mrs. Murray, and against one or two of the other players that wasn't—he was a man that usually—in fact, he never did that before." In regard to his mental condition subsequent to December, 1928, he says: "I would say it was like anybody else's that was just about ready for the grave and had been sick as long as he was,—that his mentality was a way down, * * * he was just down and out, a sick man, that's all; he could not concentrate; he couldn't keep on subjects, and he was radical on things." On cross-examination, he says: "I am giving you the impression that he was not acting natural and normal, or he was not acting the same as any of the rest of the men there; that's the best I can tell you." "Q. What urges you to that conclusion? A. Why his actions. * * * the man was not normal—he wasn't his natural self; and I am judging that from all of his actions and the way he behaved himself at the party." He says that on a

picnic, the date he does not remember, Edwards wouldn't eat white bread, said he would just as soon eat poison as eat white bread, but he ate a lot of cake, and took some of it home with him. He says further: "I considered him a sick man, with spells that he really wouldn't be fit for any kind of a business deal, or anything else." He says that he thought there were times when Edwards was insane on all things.

Mrs. George Kahrs, one of contestant's witnesses, testified that she first met Edwards in 1925 and that she and Edwards frequently played tennis together before she went to work in the mornings and on Sunday mornings, and that Edwards was a most "admirable character in every way" when she first became acquainted with him. She visited Mrs. Murray's apartment in April, 1929, the spring before Edwards died, and saw Edwards there. At that time he looked "fifteen or twenty years older. The day before, when I had seen him, he had been well, and the time when I saw him up there, he looked very ill." She says she inquired after his health and he said that he had been taking some baths or massage from some young man "and he went on talking about that for about half an hour, wandering around and I was greatly surprised, because Eddie was usually a man of few words, and did not dwell on a subject unnecessarily. * * * He was acting in an unnatural manner; * * * he was sitting with his legs apart on his chair, and his legs were all swollen up so they almost filled his trousers. * * * I concluded that at the period that I visited him there in the apartment, at the time I just mentioned, he certainly was mentally off. Q. What do you mean by 'mentally off'? A. Well, he was acting in an unnatural manner, mentally not himself, abnormal; that describes it exactly."

As stated contestant, Edwards' only child, was born on July 6, 1905. She married Earle in the spring of 1928. All the witnesses who testified in respect thereto, say that Edwards loved his daughter with an intensity which amounted almost to adoration. She was amiable, affectionate and talented and she idolized her father. In respect to the mutual love of the father for his daughter and of the daughter for her father, there is not a single discordant note in the testimony. In fact, proponents so admit in their petition for the reprobate of the will, and they state in their brief filed here that this love upon his part continued up to the time of his death. In another part of their brief, however, they contend that Edwards lost all affection for his daughter because, at the time of the separation and divorce of Edwards and his wife in 1926, she sided with her mother against him. They base this later contention upon the following excerpt of testimony given by contestant while on the stand, in which she said: "I tried to reason with my father. I tried to show him that he was being cruel to my mother; that he was very unkind to her; that he was not being fair to her and he would not listen to me." From this statement of hers, they argue that she sided with her mother and took her mother's part against her father and that that fact caused him to lose all his affection for her. This contention upon the part of the proponents is refuted by all the testimony. During the remainder of that year, as well as during the following year, he wrote her numerous letters in which he manifested toward her the same love and affection that he had always entertained for her before the separation took place. After spending the summer of 1926 with him, the daughter returned east in September of that

year and immediately following her departure, he made a new will in which he left to his daughter a substantial part of his estate. In the summer of 1927, the daughter met him at Los Angeles upon her return after her graduation from Wellesley with honors and spent a considerable time with him at his apartments in San Diego. She then came to Portland with him, keeping house for him there for two weeks and, after her return east that year to take a postgraduate course in music, he stated to others that it was the pleasantest summer he had ever spent. On the day she returned east that year, he made another will, in which he gave her a larger portion of his estate than he had in any of his former wills. In the spring of 1927, she wrote him that she had met and fell in love with Mr. Earle. After receiving that letter, he wrote his daughter on April 24, 1927, saying: "You need have no apprehension that I may make any objection to any young man that you decide on for a husband. I am glad that you have made a decision." He also wrote her: "Your ancestors have saved for two generations to try and leave you financially independent." Later and on May 7, 1927, he wrote her: "You may rest assured, however, that I have no reason or intention to ever advise you not to marry this man, or any other man whom you may select." On the following Christmas he sent his daughter his check as a Christmas gift.

After the daughter's graduation in 1927 and while with him during her summer vacation, she told her father that she was engaged to Mr. Earle and wanted to marry him; that he was a student and intended to study law which would require his attendance at a law school for three years before graduation, and that she wanted to return east in order to be near him. Ed-

wards made no objection but advised her that, since Earle was studying law, that would be the proper thing for her to do; that it would develop her mind and be a benefit to her in after years. He advised against a postgraduate course in music but did not insist that she should not take up music. She informed her father that she intended to be married the following year and, upon leaving her, he promised to attend her wedding. With that understanding she returned east and took up music and was married the following year.

Up to that time he had always said, both in his letters and conversations with his daughter, that he hoped she would marry as soon as she graduated and that she would proceed to raise a family so that he could enjoy the children. He expressed the same wish to others. Mrs. E. M. Morgan says that in the summer of 1926, at his home in Portland, he stated to her and others then present, that when Virginia was graduated he wanted her to marry, adding that if she would get married upon her graduation, he would give her a wedding trip to Europe, and he told them at that time that he wanted her to have a family so that he could enjoy the children. Mrs. Helen E. Harding says Edwards told her that he hoped Virginia would marry and proceed to have a family upon her graduation. Mrs. Murray testified that Edwards repeatedly stated to her that he hoped his daughter would marry.

In his letter to his daughter at Christmas time in 1927, he stated that he was glad she was really doing something with her music. Some time that winter she wrote him, stating that Earle had gone to Florida to see his father. Upon receipt of that letter, he wrote her saying that he thought it very extravagant for Earle to go to Florida to see his father, and that he was sorry he had promised to see her married. Again,

on March 14, 1928, the day on which she was married, she received a letter from her father in which he stated that he thought Earle was an adventurer who wanted to marry her for her money. In the summer of 1928, he wrote her that she had left him just like the birds leave the nest; that she no longer loved him; that the parents cared for the child but the child never cared for the parents; that it was natural for the child to leave the parents but that they had to bear up with it, and in his case, he was going to forget his daughter—put her out of his life—and that he did not want to correspond with her any more; that corresponding with her was distasteful to him and he wanted to break off immediately, and he did not want to have any more correspondence with her.

There is nothing in the evidence to show any reason for this sudden revulsion upon the part of Edwards toward his daughter except his mental condition at the time or the fraud and undue influence of his sister, Mrs. Longo, to which we will later refer. Within a few days after his daughter's marriage, Edwards changed the name of the beneficiary of an insurance policy that had been issued to him in 1919 from Edwards and Company to that of his niece, Ann Elizabeth Whiting, the daughter of Mrs. Longo, and, when Mrs. Edwards returned west after the marriage of her daughter, she received a letter from Edwards expressing his sympathy on their mutual loss of Virginia. On September 27, 1928, he again wrote Mrs. Edwards, stating that on October 31 he would deposit in Portland the securities for the establishment of the $90,000 trust. In this letter, he says: "You remember I suppose that the income was stipulated at $400 per month, of which $300 was to you and $100 to

Virginia. Of course, as she is now married, maybe she won't need it and if you insist the whole amount might be arranged as payable to you."

Mrs. John W. Kemp, who resided at Los Angeles, and whose husband, until his death in January or February, 1929, was the head of the firm of Kemp, Partridge and Kemp, and who had been employed by Edwards to negotiate the settlement with his wife, testified that shortly after contestant's marriage, Edwards came to her house and said: "Mrs. Kemp, I thought I was going to hold myself together—I thought I was going to get over this, but the minute I saw you, it has all come over me," and she says he sat down and put his head forward on his hands and knees and indulged in a debauch of self-pity, that he had lost Virginia, that he would never see her, and that he had looked forward to seeing her at Christmas time, and seeing her and her children. She says she asked him "Well, Mr. Edwards, does it mean nothing to you that Virginia has married the only man she ever loved?" and he said, "Mrs. Kemp, a woman doesn't have to marry the only man she has ever loved." "I know a woman who thought she was in love with a man, and they pulled out all right. * * * She doesn't have to marry that man." Mrs. Kemp says: "In that conversation, when he spoke of this woman that could turn a man down and go and live some place else, he said, 'She could marry a man even though she didn't love him so much,' and I said, 'Mr. Edwards, some women, but not Virginia.' And so that was in May, and it didn't seem to be so much against Virginia, but his loss of Virginia,—that she was across the continent, and she had gone from him, and I said, 'Mr. Edwards, you have lost your little playmate; you are feeling sorry for yourself.'"

In November, 1928, contestant received word that her father's health was very poor and that he was in a very serious condition. She immediately came west and, upon reaching Los Angeles, she went to her mother's apartment and called her father over the telephone. Upon hearing her voice, he told her he was delighted and two days later he came to Los Angeles and spent a week there with his daughter and Mrs. Edwards, stopping at the Elks' club. The father and daughter then went to San Diego and she remained with him for several weeks at his apartment. She says that her father was very happy to have her with him, but that she was shocked at his physical appearance.

Mrs. Edwards testified that when Edwards came to Los Angeles to meet his daughter, he stayed a week and "was in a very happy frame of mind being there with Virginia, and he included me in a great many of the things they did." Contestant stayed in San Diego with her father until two days before Christmas, and while there they visited the home of Mrs. Kemp, and this is Mrs. Kemp's testimony as to what took place at her home between Edwards and his daughter; less than two months before the will in question was made:

"They went up to Mr. Kemp's bedside and Mr. Edwards was giving his theory of diet, which was a hobby of his, and then explaining the effect of certain diets, and doing it most logically, and Virginia sat there by the bed, and never took her eyes off her father; she was wrapped up in her father; she admired his mind, and she admired him; and while she adored him as a father, I could see that day that she thought he was extreme. Mr. Kemp spoke of it—of the adoration of that girl for her father. Well, then, they came down stairs, and I played for Virginia to sing, and Mr. Edwards was over in the corner getting

some books out. Virginia sang, and I glanced up, and he was looking at her, beaming upon her. Well, after she got through, he went over, came up to her, and she took his arm, and he took her hand and patted it, and loved it, she smiling up at him, and they walked back and forth, absolutely unconscious that I was there, like a pair of lovers, back and forth, and back and forth, and he patting her hand and beaming down on her.''

Mrs. Kemp says that later in the following summer of 1929, she received a telegram from Mr. Edwards, asking her to meet him for lunch down town, and she says:

''It was frightfully hot, so I wrote him back that I thought he would enjoy coming out here with me, and it was cool; so he answered—he said that he thought it would take me away from unpleasant surroundings; he just did this to get me away from home, but it wasn't that he had to apologize, you see. It was only that he thought that he was doing the kind thing to me. He came out in a taxi, a little, sick, brown man, with his hair matted about his forehead, and dull, dull eyes—the sickest looking man I ever saw on his feet. He came in here and collected himself for a few minutes; and I thought then I should have to put him to bed. He went out to the breakfast table, and I had made a resolve that I would not mention Virginia. I knew that he was going to be here an hour or two, and I resolved that her name should never come from my lips; I would not remind him. He looked up with that sick, disheartened, blank stare: 'Mrs. Kemp, I have lost Virginia.' 'Well,' I said, 'you have gained a son; you haven't lost Virginia.' Well then, we came in here, and it was a changed Mr. Edwards from the time we began to talk in here. He said, 'You know, Mrs. Kemp, I was disappointed; I wanted Virginia not to give up her career—that is, her music.' * * * 'Why,' I said, 'Mr. Edwards, what is a career?' I said 'In a few years, she will not be singing * * * she

is building her own little home, building that little nest, and her mother said she even made the curtains at the windows. That is the way to do; grow together, to start out building up. She writes of making a tie for Harper.' He sat there with that staring, that blank uncomprehending look for a minute, and then he said: 'Mrs. Kemp, you have set me thinking.' Then he comes in—it is a case of Doctor Jekyll and Mr. Hyde: it is Mr. Hyde one time, and Doctor Jekyll again; he is a changed being. He starts in with the letters that he has had from this child he has lost, and he tells in detail how she is coaching Florence Claire, that is the little sister of Harper, (her husband)   *   *   *   He is so happy to have her doing something worth while. Then we go on, and we discuss Virginia's life, and what she is doing, and these little things that I have told you, just about the coaching of the girl, and he is so happy that she is occupied.   *   *   *   I said, 'Of course, you know what Virginia's marrying Harper meant to me,—how fine he was, for she didn't marry him hastily, she thought it over, she was not engaged but a short time,' and I said, 'I sat by Mrs. Bullock at a tea one day, and happened to say that Detroit meant to me just one person,—Virginia Edwards—who had married Harper Earle, and asked did she know the family, and she said, 'Yes, I know they have a fine standing there. I haven't seen Harper since he was a little boy, but he couldn't be anything but a success, if he is like his father.' Mr. Edwards knew it; he knew only that he had just that feeling that his daughter was away. Well, there was some conversation, and then Mr. Edwards was the bright, happy Mr. Edwards that I have seen when he was with Mr. Kemp and me, and when he took us to dinner, he was just as jovial as any boy of twenty, when we were at the Ambassador that night; and then when Mr. Kemp and I were together with Mr. Edwards, he would pull himself together; he was in physical distress, and he would get up and walk around a while, and then finally he went out in the living room and walked back and forth   *   *   *   and came back and took a chair in the middle

of the room. He said 'Mrs. Kemp, the only thing I have against Virginia's husband is his youth.' I said, 'Well, Mr. Edwards, give him time, and he will overcome that,' and he went out of this house as happy as I have ever seen anybody; the world was a bright place to him. He was going to see Mrs. Edwards, and the taxi was out there; he was impatient to get to her, to visit with her, spoke so beautifully of her and Virginia—there was nothing wrong,—nothing but the youth of that boy.  *  *  *  he got here at one o'clock, and I think it was probably between three and four, because he had to take the evening train to Portland, and he wanted to have a visit with Mrs. Edwards before he left; and as he left, he said, 'Mrs. Kemp, I can't tell you what you have done for me.' He shook hands, and he says, 'I can't tell you what you have done for me.' "

It appears from the evidence that until Edwards became ill, he was of a very positive nature, very stubborn in his own opinions and not easily influenced. He would argue with no one. If anyone disagreed with him, he would leave them and not argue the matter with them. His sister, Mrs. Longo, however, the evidence shows could always influence him. She had the power of insinuating in his mind thoughts and ideas by suggestion and make him believe they originated in his own mind. The evidence shows that in January, 1928, Mrs. Longo for the first time learned definitely that the daughter was about to marry Earle. Up to that very moment there is not a syllable of testimony in the entire record of any revulsion of Edwards in his love and affection for his daughter. The uncontradicted evidence of Mrs. Murray is that as soon as Mrs. Longo learned of the contemplated marriage, she commenced to write Edwards, criticising his daughter. She wrote him that Virginia, when she graduated, should have come west and stayed with her

father; that she should have waited until Earle had finished law school before marrying him, and that, if Virginia had had a proper appreciation for her father and had loved him, she would have stayed with him at least one year before she married. She also wrote him that Virginia had made her choice between the Earles and him and that the Earles were fortunate to have obtained a daughter who was a cook, housekeeper, nurse and tutor. Mrs. Longo was a witness in the case and she did not contradict any one of these statements nor was there any attempt made by cross-examination of Mrs. Murray to discredit her testimony in respect to any of these matters. Mrs. Longo's hostility to the daughter is disclosed not only in the letters above mentioned but also in the subsequent statements to Edwards and to others. In April, 1929, in discussing the matter with Mrs. Catherine Hanna, a close friend of the Edwards family and of Mrs. Longo, she said: "Well, you know, Tom is absolutely through with Virginia.   *   *   *   I feel the same way about it.   *   *   *   The idea of Virginia marrying a boy who hasn't finished school." On a later occasion she told the same thing to Mrs. Kemp, saying: "Virginia should not have married; she should have come west and stayed here a year with her father.   *   *   * He gave her her education and she should have given him that year." Again in August of that year she told Mrs. Hanna that she was very much interested in Sanford Whiting, Jr., who was her stepson and that she had succeeded in getting Tom, her brother, interested in him, and she said: "I hope Tom is going to leave Sanford something in his will." The will shows that she was successful in securing for him 1/20 of the net income of testator's estate. Mrs. Longo also said to Mrs. Kemp: "I said to Tom, 'that's what you get

for sending her to an eastern college.' '' Mrs. Kemp, in referring to Mrs. Longo's attitude toward Virginia, said: "She was entirely against Virginia's marriage with Mr. Earle, and seemingly trying to influence her brother, and keep him in a dark, drab mood." Just after Edwards' death, Mrs. Longo told Mrs. Edwards that Virginia had been disloyal to her father. Again, in a conversation with Mrs. E. E. Morgan which took place just before the daughter's marriage, Mrs. Morgan said to Mrs. Longo: "Isn't it too bad that we cannot see Virginia married?" to which Mrs. Longo replied: "Yes, I am as mad about it as I can be and Tom is just as mad about it as I am."

In view of the above statements made by Mrs. Longo in her letters to her brother and the declarations she made to others about Virginia, it is obvious that she intended to prejudice the disordered mind of her brother against his daughter and thereby secure for herself and the members of her own immediate family a part at least of what otherwise he would have left to his daughter. These declarations made as they were after January, 1928, to Edwards of whom she had said in 1926 that his illness was affecting his mind, and knowing as she did in 1928, that his mental and physical condition had gradually grown much worse, shows, when taken in connection with this will, that she was not only attempting to but that she actually did succeed in poisoning the mind of her brother against his daughter and in leading him to believe that his daughter had forsaken him and no longer loved him. It was not true that the daughter had forsaken the father and no longer loved him, and Mrs. Longo knew it was not true when making those declarations. Her declarations to that effect were fraudulently and falsely made and had the effect of causing her brother

to make this unjust and unnatural will, virtually disinheriting his daughter, under the unfounded delusion that his daughter no longer loved him and that she was lost to him forever. Such a will ought not stand.

It is an established fact recognized both by the medical profession and the courts that mental derangement may be confined to one particular phase of a person's life. Both Doctor Evans and Doctor Burkes tell us that insane asylums are full of men who are good card players and talk rationally on most subjects.

There is not the slightest allusion in the testimony to any act of the daughter of disloyalty or of want of love upon her part for her father or that she ever acted contrary to his wishes or did anything which could afford any ground for his sudden revulsion toward her. This revulsion can be explained only, so far as the whole evidence shows, upon the mere fact that, because of the daughter's marriage, it was no longer possible for her to remain in his presence and, from the fact of her absence, he imagined he had lost her. This unfounded belief upon his part was the product of a disordered mind operated upon by the false statements of his sister.

As was said by the court in *Dew v. Clark,* 3 Addams' Eccle. Rep. 79, 180:

"In most cases of delusion, the delusion founds itself, originally, on some slight circumstance, the magnifying of which, beyond all reasonable bounds, is nearly, or quite, as good in proof of its being a delusion, as the taking up of some absurd prejudice, which is utterly unfounded, or that rests upon no basis."

"It is of the essence of an insane delusion that as it has no basis in reason so it cannot by reason be dispersed and is thus capable of being cherished side by side with other ideas with which it is rationally inconsistent." Smith v. Tebbit, 1 Law Rep. 398, 434.

As was said by the court in *America Bible Society v. Price*, 115 Ill. 623 (5 N. E. 126, 130):

"Obviously, if there be morbid or insane delusion in the mind of the testator as to one of the natural objects of his bounty, its effect upon his capacity to reason in regard to that object of his bounty could in nowise be measured by his capacity to reason upon subjects unaffected by that delusion."

We, therefore, conclude that this will is the joint product of a morbid delusion of the testator that he had lost the love of his daughter and of the fraudulent representations made to him by his sister, inducing him to entertain that delusion and that, because thereof, the will is invalid and must be set aside. In order, however, that there shall be no misunderstanding of the reasons for our decision, we say unqualifiedly that it is not alone because the will itself is unnatural and unjust that it is set aside. We base our decision upon the fact that the testator's mind at the time he made the will was seriously impaired and he had been fraudulently led to believe that his daughter had left him and no longer loved him and that these facts, when coupled with the provisions of this will which virtually disinherit the daughter, are sufficient grounds for holding the will to be invalid, and, upon those grounds, we have been constrained to so hold.

The decree of the lower court should be reversed and a decree should be entered here setting aside the will and declaring that Edwards died intestate in law, but since the court is evenly divided, one of the justices being disqualified, the decree must, under the provisions of the statute, be affirmed and it is so ordered.

CAMPBELL, J., not sitting.

BEAN, C. J., and BROWN, J., concur in this opinion.